**John V. GROMBACH, Appellant,**

v.

**OERLIKON TOOL AND ARMS CORPORATION OF AMERICA, a corporation, Appellee.**

No. 8000.

United States Court of Appeals Fourth Circuit.

Argued Jan. 21, 1960.

Decided March 14, 1960.

---

6. See note 4, supra.

Richard L. Merrick, Washington, D. C., and Stanley M. Lazarus, New York City (Thomas H. King, Washington, D. C., on the brief), for appellant.

Frank M. Parker and George H. Ward, Asheville, N. C. (Harold K. Bennett, Asheville, N. C. on the brief), for appellee.

Before SOPER and BOREMAN, Circuit Judges, and BARKSDALE, District Judge.

BARKSDALE, District Judge.

This diversity action was instituted on May 27, 1958, by John V. Grombach, formerly an officer of the United States Army, a citizen and resident of New York, against Oerlikon Tool and Arms Corporation of America, a Delaware Corporation doing business in North Carolina, seeking damages for the alleged breach by the defendant of a written contract entered into on February 10, 1953. Defendant's motion for a summary judgment having been previously overruled, the case came on for trial by a jury on August 5, 1959. At the conclusion of all the evidence the district court granted defendant's motion for a directed verdict, judgment was entered dismissing the plaintiff's action, and from this judgment plaintiff has prosecuted this appeal. Since there was a directed verdict against him, the evidence must be viewed in the light most favorable to the plaintiff.

Early in February 1953, Grombach, who described himself as "a specialist in the harnessing of foreign basic research to United States National Defense, particularly with regard to security angles and the production and research angles", at the invitation of one Emil Buehrle, went to Zurich, Switzerland, "to have a conference with him with regard to solving his problems and becoming his consultant." Buehrle, a Swiss citizen, had varied business interests, but he was primarily a munitions maker. After several conferences, Grombach and Buehrle, on February 10, 1953, entered into a written contract in the form of a letter confirmed by the signatures of both parties, which is the basis of this action. So far as pertinent, the contract is as follows:

"I. This is to confirm our understanding that you will serve in the United States as general and public relations consultant for the Oerlikon Machine Tool Works Buhrle & Co. (Werkzeugmaschinenfabrik Oerlikon Buhrle & Co.) Zurich, Contraves Ltd., Zurich, the Oerlikon Tool & Arms Corporation of America of Delaware and North Carolina, Olkon Research Corporation in Washington, D. C. and for me personally and for any subsidiary or affiliated company or companies owned directly or indirectly by me.

"II. It is agreed that your consultant status shall begin as of this date and shall be for a period of five years unless sooner terminated as specially and specifically provided for in this letter.

"III. You shall receive a salary or fee of U.S.A. $25,000.—(twenty five thousand dollars) per year or a total of U.S.A. $125,000.—(one hundred and twenty five thousand) in five years, payable quarterly which shall be full compensation for your part-time services as a consultant and make you reasonably available to the companies and their management for consultation and or services and also to me personally.

\* \* \* \* \* \*

"VI. It is agreed that I shall have the right to cancel this five-year agreement under the following conditions:

"a) If the President of the Oerlikon Tool and Arms Corporation of America objects to your being retained as consultant to his company, I shall have the right to cancel this agreement at the end of one year or on February 9, 1954, by giving you written notice by registered mail before May 1st, 1953. In that case you will serve only the other above mentioned companies to February 9, 1954. \* \* \* "

The nature and functions of all the companies mentioned are not clear, but it seems that Buehrle owned or controlled all of them. It further appears that one or more of the Swiss companies were engaged in the manufacture of munitions for export, and that the defendant Oerlikon Tool and Arms Corporation of America (hereinafter referred to as "O.T.A.") entirely owned by Buehrle, personally, or through stock ownership in a holding company, had been organized for the ultimate purpose of manufacturing munitions under Swiss patents in the United States when, as and if security clearance could be obtained, one of the prerequisites of which

being at least seventy-five percent ownership by American citizens. It is to be noted that neither Buehrle nor any of the other companies are named as defendants in this action; O.T.A. is the sole defendant.

Following the execution of the contract, Grombach undertook to assist in the procurement of an export license from the Swiss government for munitions manufactured by one of the Swiss companies for sale to the United States Government, and to make contacts with his friends in the Department of Defense and in the armed services.

On April 22, 1953, within the time when cancellation of the written contract was permitted by paragraph VI (a) of the written contract, Buehrle, by cable, requested of Grombach that the cancellation period be extended until June 30, 1953. Grombach first suggested by cable a shorter extension, but on April 27, 1953, cabled to Buehrle an agreement to extend the cancellation period until June 30, 1953.

By registered letter of June 24, 1953, Buehrle gave Grombach notice of termination of the contract, the letter, so far as pertinent, reading as follows:

"With reference to the conversation I had with you during my last stay in the States respecting retaining you as a general and public relations consultant for Oerlikon, I hereby give you—as agreed with you—according to the provisions of Article VI(a) notice of the termination of the Agreement between you and all my firms, such termination to be effective as of February 9th, 1954. The notice term of May 1st, 1953, has been prolonged by mutual agreement (see your cable of April 27th, 1954).

"The President of Oerlikon Tool and Arms Corporation of America having objected to your being retained as a consultant to his company, your activity until February 9th, 1954, i. e. until the termination of our Agreement, is limited to

my companies here in Zurich, viz. the

Oerlikon Machine Tool Works, Buhrle & Co.,

(Serkzeugmaschinenfabrik Oerlikon, Buhrle & Co.)

Zurich, and the

Contraves Ltd., Zurich.

"I ask you to be good enough to return to me the original authorization dated February 10th, 1953, which includes the Oerlikon Tool and Arms Corporation of America, Washington, D. C., as well as the Olkon Research Corporation, Washington. Consequently, I am sending you, herewith enclosed, the new Authorization.

"According to Article III of our Agreement, you will receive for the whole year a retaining fee of U.S.A. $25,000.—, payable quarterly. The first quarterly payment was due on May 10th, 1953. Inasmuch as I am in arrears with the first payment, I am sending you through my bankers simultaneously the second quarterly payment. You will consequently receive within the next few days a cheque for $12,500.—(twelve thousand five hundred Dollars). I would appreciate it if you would kindly let my company here have a fee note in two copies for this amount, mentioning that you already received payment for same. We need this bill for tax purposes.

"As to the third and fourth quarterly payments due November 10th, 1953, and February 10th, 1954, i. e. on the termination of the Agreement, I ask you to send the bills in two copies about ten days in advance to my Secretary, Dr. O. Maurer, here in Zurich. As expressed in your letter of June 2nd, he will arrange for the payments in good time.

"I have already expressed my regret for my inability to change the situation. Yet, I venture to hope that, nevertheless, you will—as you assured me already orally—maintain a loyal attitude towards me and the companies I control.

"You would oblige, for the sake of regularity, by confirming the contents of this letter."

To this notice of termination of contract, by letter dated June 30, 1953, Grombach replied to Buehrle as follows:

"This will acknowledge receipt of your cancellation and of the $12,500 for the first and second quarterly payments.

"I desire to assure you of my personal loyalty to you and your companies and shall do nothing except try to help you and your companies, at least until February 10, 1954. From now until then as you know, and pursuant to the contract, I am available to advise or to help you in any way.

"I only hope that you will give me a further opportunity to prove myself as I feel that I have on the matter of the licenses, the postponement of the Lethal Munitions Act, and other matters involving the status and reputation of your interests in the U.S.

"With kindest personal regards, I am

 "Sincerely,
 "/s/ John V. Grombach"

Besides this letter of June 30, 1953, acknowledging receipt of Buehrle's cancellation of the contract and raising no question as to its propriety, by letter of June 24, 1953, written before the receipt of the cancellation notice, Grombach wrote Buehrle as follows:

"As explained in my cable of June 22nd, I have not yet received payment due me since May 10, nor the written cancellation notice. Naturally, the last is not welcome, but in the fact that I like to make detailed plans for the future and have a personal service business, you can well understand that I want to know exactly where I stand as soon as possi-

ble. Fortunately, I have just about reached the limit of the amount of business which I desire to handle for the present, and if and when given notice, I am certain I can replace your account before February of 1954."

Again, Grombach wrote Buehrle a long letter dated July 14, 1953, in which, amongst other things, he said:

"This is not in any way to try to get you to withdraw your cancellation or to retain me again, for I expect to have another large account before February 10, 1954, and due to the fact I believe in the personal service nature of my business, and because of tax problems here, I limit myself to a certain number of accounts."

As requested in the cancellation letter of June 24, 1953, Grombach returned without question the original written authorization to act as general and public relations consultant for defendant and other companies.

By letter of December 17, 1954, Grombach wrote Buehrle a letter which is in part as follows:

"This is to personally and directly wish you and yours a Merry Christmas, and a Happy, Prosperous New Year, and to express my hope that you have recovered from your accident. Notwithstanding the fact that I evidently have never gained your confidence or sold you on my ability to completely solve your American problems, I have the highest respect and regard for you. I only hope that some day you may afford me a real chance to show you what I can do. * * * While I admire greatly your loyalty and your family spirit to your principals here, nevertheless we in America run our business based upon results obtained, and I should say that you could not possibly consider they have been successful. Therefore, why not give someone else a chance? If you believe in face as the Orientals do, you will not be proving you were wrong, for after all, you did purchase my services and dispensed with me only because your principals here and I could not get along together; that is, so long as I had no authority."

In August 1951, Buehrle had employed one K. B. Wolfe, a retired officer of the United States Army, as President, General Manager and Chief Executive Officer of O.T.A. Wolfe owned no stock in O.T.A., but was a director in the company, as was Buehrle. That Wolfe, President of O.T.A., objected to Grombach's "being retained as consultant to his company", there can be no doubt. As Wolfe put it, in a conversation with Grombach in March 1953, shortly after the signing of the contract here in controversy,

"I advised Mr. Grombach that in my judgment the American corporation had no requirement for a public relations man, particularly with respect to a man of the high pressure tactics of Mr. Grombach.",

and that further, in the same conversation:

"I instructed him that he would take no action with respect to the activities concerning the American corporation."

By letter of March 11, 1953, Wolfe wrote Grombach, that:

"It is understood that until Mr. Buehrle arrives in this country and I have had the opportunity to discuss with him the entire situation regarding Oerlikon affairs, you will, insofar as O.T.A. is concerned, take no action whatsoever until you receive further instructions from me.",

although further in the letter he said that he had no objections to Grombach's carrying out Mr. Buehrle's instructions in regard to his actions with the Swiss authorities on the license matter, and that he would be glad to have him prepare plans for the separation of O.T.A. from the other companies.

Upon the facts, as set out above, it would appear that the termination by Buehrle of the contract of February 10, 1953, insofar as the services of Grombach to O.T.A. were concerned, was strictly in accord with the cancellation provision of the contract, as extended by mutual agreement. However, at the trial, Grombach undertook to testify that, before his agreement with Buehrle was reduced to writing on February 10, 1953, Buehrle told him that he wanted a cancellation clause included in the agreement as a "face-saving device" because he did not want to hurt the feelings of General Wolfe, President of O.T.A., by hiring Grombach without consulting him, but that there was an oral and secret agreement between them that the cancellation clause would never be used. Inasmuch as Buehrle had died in November, 1956, long before the institution of this action, there was no way of ascertaining his version of what took place before and at the time of signing the contract. The district judge ruled that this evidence of Grombach was inadmissible as being in violation of the parol evidence rule, but permitted him to testify in regard to the alleged oral and secret agreement for the record in the absence of the jury.

Grombach also contended at the trial that his agreement to extend the cancellation period from May 1, 1953, to June 30, 1953, was without consideration and therefore invalid.

Defendant O.T.A. had filed a plea of the statute of limitations. The district court did not directly pass upon this plea, but having ruled that parol evidence of the oral and secret agreement, varying the terms of the written contract, was inadmissible, and that the agreement for the extension of the cancellation clause was valid, directed a verdict against the plaintiff Grombach and entered judgment against him.

Defendant, O.T.A., has contended throughout this proceeding that Buehrle had no authority to act as its agent in employing Grombach and that the contract of February 10, 1953, was not its corporate act, and therefore not binding upon it. Certainly, it does not appear that there was any corporate action authorizing or approving and ratifying the contract of February 10, 1953. The sum of $25,000.00 paid to Grombach as his full salary for one year, was paid, not by O.T.A., but by one of the Swiss companies or by Buehrle personally. Neither is there any evidence that Buehrle was an officer, or that there was any resolution authorizing him to act as its agent. Indeed, there is no evidence of any corporate activity of O.T.A. such as might ordinarily be recorded in a minute book. It does appear that Buehrle directly, or through stock ownership in a holding company, individually owned, or at least controlled, O.T.A. The employment of Wolfe seems to have been by his sole act.

■ The general rule applicable in such situations is as follows:

"Contracts made directly by the corporate stockholders to whom no authority has been delegated with third persons, do not bind or affect the corporation, whether the stockholders thus assuming to contract on its behalf own little or much of its capital stock. In other words, individual members of a corporation cannot, unless authorized, bind the body by express promises. Furthermore, no corporate engagement can be implied from their unsanctioned conduct or declarations." 13 Am. Jur. 469.

In the view we take of the case, it is not necessary to decide whether or not O.T.A. was ever bound by the contract signed by Grombach and Buehrle on February 10, 1953. Therefore, assuming, but without deciding, that O.T.A. was bound as a party to the contract of February 10, 1953, when it was executed, several questions of law are presented.

■ Taking up first the question of whether or not the parol evidence rule

rendered inadmissible the proffered testimony of Grombach that *dehors* the written contract, there was an oral and secret agreement between him and Buehrle that the cancellation clause would never be invoked, we are of the opinion that the district court's ruling that this evidence was inadmissible was correct.

There is no evidence in the case of an oral agreement amending the written contract entered into subsequent to its execution. If there was any oral and secret agreement, as asserted by Grombach, it was prior to, or contemporaneous with, the written contract. It is hornbook law that all prior discussions and negotiations are deemed to have been merged in the subsequent written instrument insofar as it covers the matters previously discussed. Of course, there are exceptions to the parol evidence rule, and there may be contracts which are oral in part and written in part. But here, the matter of cancellation was specifically dealt with in the written contract. The oral and secret agreement asserted by Grombach would not only vary the terms of the written instrument, but would be directly in contravention of the right of cancellation set out in clause VI (a) of the contract, so as to render it nugatory. As to such a situation, paragraph 2435, page 116, Vol. IX, Wigmore on Evidence, third edition, seems most appropriate:

"Agreements not to Sue or not to Enforce, or to hold Conditional only.

"(a) Where an obligation is embodied in a single document, the very essence of the obligation is its validity and enforcement. Hence an agreement alleged to have been a part of the transaction, that the obligation should *not be used as binding* or enforceable can never be permitted to be shown, for the writing necessarily determines that very subject to the contrary; in the ordinary phrase, it is necessarily inconsistent with the right. * * *

"(b) An extrinsic agreement providing a *condition qualifying the operation* of a written obligation is of course equally ineffective; for an obligation absolute is plainly exclusive of a condition. So far as the present principle is concerned, there is no doubt."

To the same effect, is 3 Williston on Contracts, Sec. 639, p. 1835:

"The general rule is clear, that a parol agreement, which is in terms contradictory of the express words of a contemporaneous or subsequent written contract, properly interpreted, necessarily is ineffectual and evidence of it inadmissible, whether the parol agreement be called collateral or not. If there are exceptions to the rule, they are made where the formal instrument is issued in its usual form, but its terms limited by a parol agreement."

See also 12 Am.Jur., Sec. 233, p. 757:

"A parole agreement inconsistent with a written agreement made contemporary therewith is void. Parole understandings, although they induce the making of the written contract, are merged in the writing so that they cannot be used to change the contract or show any intent different from that expressed in the instrument."

In instances where contracts are partly in writing and partly oral, parol evidence can never be admitted to prove previous or contemporary oral understandings in conflict with the terms of the written instrument, as is pointed out in Roebuck v. Carson, 196 N.C. 672, 146 S.E. 708, 709:

" 'If a contract is not within the statute of frauds the parties may elect to put their agreement in writing, or to contract orally, or to reduce some of the terms to writing and leave the others in parol. If a part be written and a part verbal, that which is written cannot ordinarily be aided or contradicted by parol evidence, but the oral terms,

if not at variance with the writing, may be shown in evidence; and in such case they supplement the writing, the whole constituting one entire contract.'

"The test is whether the oral terms vary or contradict the writing. This idea was expressed by the court in White v. Fisheries Co., 183 N.C. 228, 111 S.E. 182, as follows:

" 'It is true that a contract may be partly in writing and partly oral (except when forbidden by the statute of frauds), and that in such cases the oral part of the agreement may be shown. *But this is subject to the well-established rule that a contemporaneous agreement shall not contradict that which is written. The written word abides, and is not to be set aside upon the slippery memory of man.'* " (Italics supplied.)

See also Potter v. National Supply Co., 230 N.C. 1, 51 S.E.2d 908, and Bost v. Bost, 234 N.C. 554, 67 S.E.2d 745.

It is our conclusion, therefore, that the district court was eminently correct in excluding and refusing to consider Grombach's parol evidence tending to prove an oral and secret agreement with Buehrle made prior to or contemporaneously with the execution of the written contract of February 10, 1953.

■ Nor can we agree with plaintiff's belated contention that his agreement to extend the time within which the contract of February 10, 1953, might be cancelled, was invalid because not supported by a valuable consideration. As set out in paragraph VI (a) of the contract, Buehrle had the right to cancel the contract by giving written notice before May 1, 1953. By cable, on April 27, 1953, Grombach agreed to an extension of the cancellation option to June 20, 1953. The crux of the situation is that Buehrle requested, and Grombach agreed to, the extension of the time in which the option to cancel might be exercised, within the period during which, according to the terms of the written

contract, Buehrle had the unquestioned option to cancel. Buehrle's forbearance to cancel at a time when he, by the terms of the contract, had the undoubted right to do so, constituted consideration for the extension of time.

■ "The waiver of a right or forbearance to exercise the same is a sufficient consideration for a contract, whether the right be legal or equitable, or exists against the promisor or a third person, provided it is not utterly groundless." 17 C.J.S. Contracts § 103, p. 456.

In the case of Millikan v. Simmons, 244 N.C. 195, 93 S.E.2d 59, it was held that an agreement to extend an option for the purchase of real estate made before the expiration of the original option, was valid, the agreement to forego the right to close the transaction at once, constituting sufficient consideration to support the agreement to extend the option.

See also Brown v. Taylor, 174 N.C. 423, 93 S.E. 982, 984, L.R.A.1918B, 293, where the principle is stated as follows:

"There is a consideration if the promisee in return for the promise, does anything legal which he is not bound to do, or refrains from doing anything which he has the [legal] right to do, whether there is any actual loss or detriment to him or actual benefit to the promissor or not."

Since the district court dismissed plaintiff's action on other grounds, it did not become necessary for it to consider defendant's plea of the statute of limitations, and the record does not disclose that it was considered or decided below. We are satisfied that, had the district court passed upon the question, the decision would have been that plaintiff's action was barred. There can be no doubt that the cause of action asserted by Grombach arose on June 24, 1953. On that date, the written contract of February 10, 1953, executed by Grombach and Buehrle, was terminated, and if there was any oral and secret agreement between Grombach and Buehrle

that the option to cancel would not be exercised, such oral and secret agreement was breached on June 24, 1953. Grombach did not institute this action until May 27, 1958, almost five years after his cause of action, if any, had arisen, and approximately eighteen months after the death of Emil Buehrle. The limitation prescribed as to actions upon a contract by the statute of North Carolina, the forum, is three years (General Statutes of North Carolina, 1–46, 1–52).

■ In answer to defendant's plea of the statute of limitations, plaintiff Grombach asserted that, since the contract had been executed in Switzerland and was to be performed in New York, the North Carolina statute of limitations had no application to this action. Plaintiff's contention in this regard is not sound. In some instances of statutory causes of action, such as death by wrongful act, where the very statute conferring the right prescribes the limitation of time within which the action may be brought, there is some contrariety of opinion. However, it is well settled that, in the ordinary case, such as this one, of actions for breach of contract the law of the forum applies.

"Hence in general the rule of private international law is that the lex fori must control the period within which the action is to be brought." Minor on Conflict of Laws, 522.

"If action is barred by the statute of limitations of the forum, no action can be maintained, though action is not barred in the state where the cause of action arose." Restatement, Conflict of Laws, par. 603, p. 720.

"It is a universal principle that the forum governs the limitation of actions within its borders, and that laws controlling limitations are part of the law of every forum." 11 Am. Jur. 505.

See also 3 Beale on Conflict of Laws, 1620.

"Long ago, we held that applying the statute of limitations of the forum to a foreign substantive right did not deny full faith and credit, M'Elmoyle v. Cohen (US) 13 Pet. 312, 10 L.Ed. 177 (1839); Townsend v. Jemison (US) 9 How. 407, 13 L.Ed. 194 (1850); Bacon v. Howard (US), 20 How. 22, 15 L.Ed. 811 (1857). Recently we referred to ' * * * the well-established principle of conflict of laws that "If action is barred by the statute of limitations of the forum, no action can be maintained though action is not barred in the state where the cause of action arose." Restatement, Conflict of Laws, § 603 (1934).' Order of United Commercial Travelers v. Wolfe, 331 U.S. 586, 607, 91 L.Ed. 1687, 1699, 67 S.Ct. 1355, 173 A.L.R. 1107 (1947)." Wells v. Simonds Abrasive Co., 345 U.S. 514, 516, 73 S.Ct. 856, 857, 97 L.Ed. 1211.

"In the absence of legislation by Congress, and subject to the exception that the Federal Government cannot be deprived of powers belonging to it through the application of State statutes of limitation, it is established that the courts of the United States regard and enforce the statutes of limitations of the states in the exercise of their jurisdiction over causes of action at law." 34 Am.Jur. 51.

■ We hold that, even if plaintiff Grombach ever had a cause of action, as to this suit, it was barred at the time of the institution of this action. It would seem that this case is peculiarly one for the application of the statute of limitations. At the time of the alleged breach of his contract and infringement of his rights, Grombach, in writing, appeared not only to accept the termination of his employment by Buehrle, but to accept it with good grace. The record discloses no reason whatsoever why Grombach should have delayed the assertion of his rights. Yet he waited nearly five years

to assert them, and a year and a half after the death of Buehrle, the only person who could have denied the making of an oral and secret agreement in conflict with the terms of the written contract.

 Little need be said in regard to appellant's remaining assignments of error. Appellant's counsel complain of the court's exclusion of carbon copies of four letters alleged to have been written in 1953 by Grombach, three of them to Buehrle, and one to Chapuisat, Secretary of O.T.A. The court excluded the letters because notice to produce the originals was not served on defendant's counsel until the late afternoon of the day preceding trial, that there was no proof that the originals had ever been received, and that the carbon copies were not the best evidence of the letters. An examination of the letters discloses that they had little, if any, relevance or materiality, and at most, were only self-serving declarations of Grombach remotely tending to support his testimony about the oral and secret agreement. Principally they were written in the obvious effort to convince Buehrle of the undesirability of the services of Wolfe and the great benefits which might accrue to him from the services of the writer, Grombach. They were properly excluded, as was all other testimony in regard to the alleged oral and secret agreement, because violative of the parol evidence rule.

 The court did not abuse its discretion in limiting the cross examination of Wolfe on matters having no relation to the matters in controversy.

 Appellant's counsel complain that the court improperly refused to grant plaintiff's request for leave to amend his complaint, made orally near the end of the trial. No actual amendment was tendered, and no amendment to his pleadings could have saved the day for the appellant nor bettered his position.

Since we find no error in the judgment complained of, it follows that the judgment of the district court is

Affirmed.