### VLAVIANOS et al. v. THE CYPRESS et al.

### No. 5787.

United States Court of Appeals
Fourth Circuit.

Dec. 27, 1948.

---

I. Duke Avnet, of Baltimore, Md. (Albert Avnet and Donald G. Murray, both of Baltimore, Md., on the brief), for appellants.

David R. Owen of Baltimore, Md. (Semmes, Bowen & Semmes, of Baltimore, Md., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

This appeal involves competing claims to the sum of $17,837.56, which represents the proceeds of the sale of the S/S Cypress under a decree of the District Court. The members of the crew libelled the ship for wage claims approximating $24,000, and repair men and ship chandlers asserted liens in excess of $17,000 for repairs and supplies furnished the vessel. There is no dispute as to the existence or amount of the liens for repairs and supplies, all of which stand on the same footing. The problem in the case is to determine the amount of the lien claims of the seamen which, it is conceded, are entitled to priority.

The Cypress, a vessel of Panamanian registry, is an ex-Coast Guard lighthouse tender, which was bought in March, 1947, from the U. S. Maritime Commission by Compania Navegacion Dolega, S. A., a Panamanian corporation owned and controlled by Spyros G. Andreadis, a citizen of Greece, who planned to recondition her for lucrative passenger-cargo service in the Mediterranean or for sale abroad, and engaged the services of the supply creditors for this purpose. By May 25, 1947, Andreadis had recruited a crew of fourteen officers and men, including Markos Vlavianos, the master, who was also to serve as radio operator. All of the crew were citizens of Greece, except the chief engineer who was a naturalized citizen of the United States. Temporary agreements were made with each man for pay at a daily "port rate" which varied according to the nature of service; and the entire crew were fully paid at this rate through May 24.

On June 7, Andreadis and the master entered into a new oral agreement, and the crew signed written agreements embodying the same terms. These agreements, translated from the original Greek, were as follows:

"The undersigned Captain Markos Vlavianos of the S/S Cypress, representing the shipowner, and the Greek Seaman, ............, agree to the following:

"1. It is agreed with ............, registered on the Panamanian S/S Cypress, of which I am Captain, that on arrival of the ship in Greece, I shall pay to him the agreed sum of ............ drachmas, in payment for the voyage from Baltimore, North America, to Greece.

"2. It is agreed that the advance which was given in America will be deducted from the above sum.

"3. It is agreed, in the event the voyage takes over one month from the embarkation and not yet arrived in Greece, the above ............ shall be paid according to the Panamanian pay list.

"4. It is agreed, on arrival of the ship in Greece, the final payment of the above sum shall be made within (4) Four days. It is also agreed that after four days have passed, Article (3) Three shall start in force.

"5. It is agreed, in the event of sickness, accident, or shipwreck, the usual Greek decrees shall be in force. It is also agreed that expenses for subsistence to any of the above events shall be (20,000) Twenty thousand drachmas per day.

"This is in effect from the day of its signing at Baltimore, June 7, 1947."

The wages provided by the contract, if considered as payment for one month's work, were approximately four times as high as the port rate. On May 29 and June 6, Andreadis made advances of about $300 per man against the wages due under the contract, which he and the crew contemplated would shortly be signed. On June 27, however, the Cypress was still docked in Baltimore, and Andreadis, who had encountered financial difficulties, telephoned to the master from New York that the vessel would not sail for Greece, and that he should therefore pay the crew their accrued wages at the port rate. When the crew insisted on the contract rate for their services from June 7 to June 28, the master, unable to contact Andreadis, took it upon himself to ask the men to stay aboard at the port rate and keep the ship in condition.

On July 2, the seamen libelled the ship claiming wages from May 25 to June 7 at the port rate, wages from June 7 to June

28, at the contract rate (less advances) and damages for improper discharge which were alleged to amount to the sums specified in the contract to be paid to the crew upon the completion of the voyage to Greece which it was estimated would take one month. These claims, together with others which will be later discussed, aggregate the sum of $18,572.59. The crew remained on board after the libel was filed, and on August 7, filed an intervening libel claiming the additional sum of $5334.54 for wages at the port rate from June 28 to August 5, when they finally left the ship. The District Judge denied the claims as filed, but allowed the seamen a lien for the sum of $1750.65 for wages at the port rate from May 25 through July 1, and also as compensation for overtime and extra work and certain supplies.

The decision rested largely upon the interpretation given by the court to the written contract. The seamen contended that the promise of the owner to pay the sums specified in the agreement was absolute and unconditional, and fixed the rate for their services even if the ship did not sail, especially as the owner alone was responsible for the abandonment of the voyage. The judge, however, held to the contrary and in this ruling we think he was correct. Not only did the agreement provide that the sums named should be paid upon the arrival of the ship in Greece, and that the period of one month referred to in the contract was to be calculated from the date of embarkation, and that payment was to be made in Greek money, but the very high rate of pay, four times the current rate, was plainly intended to compensate the men for the great risk of crossing the Atlantic in a small vessel with an inadequate crew in order to enable the owner to achieve a profitable venture.

It follows that the court was right in refusing to apply the rate of the contract from June 7, when it was signed, until July 2, when the libel was filed. On June 7 the work of reconditioning the ship was still going on and the men were still performing the sort of service for which the port rate had been fixed, and were not exposed to the risks or hardships of the voyage;

and consequently the statement in the contract that it was in effect from the day of its signing could not have been intended to quadruple the wages until the voyage began. Since the meaning of the contract in this respect was clear, the judge properly excluded the testimony of members of the crew that they understood from oral statements made to them that the higher rate was to begin from the signing of the contract. Restatement of Contracts, §§ 240, Comment c, and 242. Williston on Contracts (Rev.Ed.1936), §§ 630, 636, 639.

The judgment was also correct in rejecting the claim that the seamen were entitled to be paid for services rendered the ship after she was libelled on July 2. Events subsequent to the seizure of a ship while she is in custodia legis do not give rise to a maritime lien; Collie v. Fergusson, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696; Old Point Fish Co. v. Haywood, 4 Cir., 109 F.2d 703; The Astoria, 5 Cir., 281 F. 618, 619; and this is especially true when the libel is filed by the crew itself. In some cases seamen have been compensated for services rendered in caring for the ship while in the custody of the marshal, e. g., The Herbert L. Rawding, D.C.E.D.S.C., 55 F.Supp. 165, 166. In the pending case the crew remained on board with the acquiescence of the marshal; but their testimony as to the services performed by them after July 2 is quite vague, and it is clear that the marshal did not ask them to maintain the vessel, and that the Maryland Drydock Company, with the marshal's knowledge, performed all the necessary service. The evidence supports the conclusion of the District Judge that the master and seamen remained aboard because they had no other place to sleep, were still hoping against hope that the ship might sail, and were desirous of avoiding possible complications with the immigration authorities.

We come then to the largest claim, that the seamen are entitled to a lien on the vessel for one month's additional pay at the rate specified in the written agreement as damages for the owner's breach of contract in failing to make the voyage. The contention is based on the statute, 46 U.S. C.A. § 594, which provides a definite meas-

ure of the damages suffered by any seamen who is discharged without cause before the commencement of a voyage which he has agreed in writing to make. It provides:

"§ 594. Right to wages in case of improper discharge

"Any seaman who has signed an agreement and is afterward discharged before the commencement of the voyage or before one month's wages are earned, without fault on his part justifying such discharge, and without his consent, shall be entitled to receive from the master or owner, in addition to any wages he may have earned, a sum equal in amount to one month's wages as compensation, and may, on adducing evidence satisfactory to the court hearing the case, of having been improperly discharged, recover such compensation as if it were wages duly earned. R.S. § 4527."

The District Judge was of the opinion that the statute was inapplicable to the pending case because the voyage was prevented by the legal arrest of the vessel, and because in any event it was speculative whether the crew would ever earn the sums promised to be paid them on the completion of the voyage. Furthermore, he was of opinion that the statute is applicable only to contracts which provide for periodic payment of wages and may not be applied to a lump sum contract because in such case there is no way in which the amount of one month's wages specified in the Act can be computed. The same interpretation is given to the corresponding British statute in MacLachlan on Merchant Shipping (7th Ed. 1932) p. 177.

 We are unable to agree with this conclusion. The statute was intended to afford a simple summary method of establishing and enforcing damages which are frequently difficult of definite ascertainment but are fixed by the statute as complete satisfaction for the breach. The Steel Trader, 275 U.S. 388, 48 S.Ct. 162, 72 L.Ed. 326. It should be liberally applied especially when, as in this case, the abandonment of the voyage and the discharge of the crew were occasioned by no fault on their part but by the failure of the owner to make the necessary provision for the voyage. It is true that the ship was taken into custody by reason of the libel filed by the crew, but the libel was filed after the men had been notified by the owner that the ship would not sail. It is obvious that the abandonment of the voyage was not due to the libel but to the owner's financial difficulties which compelled him to break his contract. See Newman v. United Fruit Co., 2 Cir., 141 F.2d 191; Brown v. United States, D.C.N.D.Cal., 283 F. 425; Jenkins v. United States Emergency Fleet Corp., D.C. W.D.Wash., 268 F. 870; The Great Canton, D.C.E.D.N.Y., 299 F. 953.

The fact that the agreement in this case provided for a lump sum payment for the voyage rather than a monthly payment does not present an insurmountable difficulty to the ascertainment of the wages for one month. It is noteworthy that the statute does not distinguish between lump sum and periodic pay agreements and if, from the circumstances of the case, the amount of wages to be earned by the crew for the period of the month can be ascertained, it should be taken as the sum contemplated by the statute when liberally construed in accordance with its remedial purpose.

██ In this instance we are met by the fact that two rates of wages were contemplated by the parties, one for work ashore, at the rate currently paid seamen, and the other for extraordinary services at sea. No doubt the monthly rate specified in the written contract ordinarily determines the amount of compensation to be paid a seaman under the statute when he is discharged without just cause; but since in this case that rate was fixed with reference to the perils of a voyage which was unexpectedly abandoned, the ends of justice will be served if the damages of the crew are computed at the rate customarily paid. That was the rate paid for the services actually performed by the crew in this case, and the allowance of wages at the same rate for an additional month will effectuate the purposes of the Act.

██ Certain miscellaneous issues remain to be considered. It is contended that the master should have been allowed a lien for services rendered under his oral contract under which he was to be radio operator as well as master. It has been held that one

who performs the services of a member of a crew, although designated as master, takes himself out of the well settled rule that a master is entitled to no lien for his wages. Swift v. Knowles, 5 Cir., 100 F.2d 977; Burdine v. Walden, 5 Cir., 91 F.2d 321; Wandtke v. Anderson, 9 Cir., 74 F.2d 381; Owen v. United States, 1945 A.M.C. 595; The Herdis, D.C.D.Md., 22 F.2d 304. In the pending case Vlavianos actually performed the duties of master and his services as radio operator were well nigh nonexistent. The record shows only that he once helped to purchase new radio equipment and inspected it after it was installed, but there is no evidence that he ever operated the equipment. The mere fact that he was called radio operator as well as captain does not give him a lien.

The appellant, Ioannis Georgiu, second assistant engineer, complains of the denial of a lien for the sum of $305. A passenger on the Cypress, who had paid that sum in advance for his passage, was so impatient at the failure of the vessel to sail on schedule that he had the captain arrested in order to secure the return of his passage money. Georgiu incurred a taxi bill of five dollars to the Central Police Station in Baltimore, where the captain was confined, and advanced the captain $300 with which to purchase his freedom. Georgiu asserts that a captain is necessary to a ship and bases his claim on the statute, 46 U.S.C.A. § 971, which gives a lien to any person who furnishes repairs, supplies or "other necessaries" to a vessel. It is obvious that the statute has no application to this situation and that the lien was properly denied.

Finally, it is contended that the seamen's lien should extend to a quantity of new rope aboard the vessel. The testimony was in conflict as to whether it was owned by Andreadis individually or by his corporation, but the District Judge did not find it necessary to decide the point since it is clear that there is no lien in favor of a seaman against the ship's cargo. It has been held that both master and seaman have a lien against freight which is enforceable against the cargo in the amount of the freight, Drinkwater v. The Spartan, Fed.Cas.No. 4,085; and where the cargo belongs to the owner and no freight is payable in the literal sense, the court will determine what would be a reasonable freight and allow a master or seaman a lien against the cargo to the extent of such "quasi freight." Sheppard v. Taylor, 5 Pet., U.S., 675, 8 L.Ed. 269; Drinkwater v. The Spartan, supra; The Marion, D.C.N.D.Cal., 79 F. 104, affirmed sub nom. Whitney v. Tibbol, 9 Cir., 93 F. 686; Clifford v. Merrill-Chapman & Scott Corp., 5 Cir., 57 F.2d 1021. In the instant case, however, since no voyage was made and no freight was earned, no lien attached to the rope.

The judgment is affirmed in all respects except as to the claim of the seamen for an additional month's wages for breach of contract which is allowed at the port rate, and the case will be remanded so that the judgment may be modified to this extent.

Modified and remanded.