C. E. HOOD, Jr., Appellant,

v.

GORDY HOMES, INCORPORATED, a Delaware Corporation, duly domesticated under the laws of the State of South Carolina, Appellee.

No. 7795.

United States Court of Appeals
Fourth Circuit.

Argued March 10, 1959.

Decided June 3, 1959.

M. H. Rosenhouse, Miami, Fla. (Jack N. Nathans, Charleston, S. C., and Rosenhouse & Rosenhouse, Miami, Fla., on brief), for appellant.

Albert W. James, Wilmington, Del. (J. Monroe Fulmer, Fulmer & Barnes, Columbia, S. C., and Morris, James, Hitchens & Williams, Wilmington, Del., on brief), for appellee.

Before SOBELOFF, Chief Judge, SOPER, Circuit Judge, and BOREMAN, District Judge.

SOBELOFF, Chief Judge.

This is the plaintiff's appeal from the District Judge's grant of the defendant's motion for involuntary dismissal of the suit, without prejudice. The plaintiff, C. E. Hood, Jr., sought to recover $25,-000.00 from the defendant, Gordy Homes, Inc., on the following contract:[1]

"This Memorandum of Agreement made and concluded at Aiken, in the County of Aiken, in the State [of South Carolina], this 27th day of October, A. D. 1952, by and between Gordy Homes, Incorporated * * * and C. E. Hood, Jr. * * *

"Whereas, the execution and delivery of this Agreement has been directed and authorized under Resolutions of the Board of Directors of Gordy Homes, Inc., and pursuant to its By-Laws; and

"*Whereas, Gordy Homes, Inc., is the owner of One-Half (½) of the issued and outstanding Capital Stock of Thomas Woods Corporation, a Georgia Corporation; and*

"*Whereas, C. E. Hood, Jr., has rendered valuable services to Gordy Homes, Inc., for which Gordy Homes, Inc., desires to compensate him in the sum of Twenty-Five Thousand ($25,000.00) Dollars, payable in the manner hereinafter set forth;* Now Therefore,

"This Agreement Witnesseth that for and in consideration of the sum of Five Dollars ($5.00) paid by C. E. Hood, Jr., to Gordy Homes, Inc., it is mutually understood and agreed:

"*1. That Gordy Homes, Inc., will pay to C. E. Hood, Jr., One-Half (½) of all monies received by it from Thomas Woods Corporation, such as dividends, or profits, until C. E. Hood, Jr., has been paid the said amount of Twenty-Five Thousand Dollars ($25,000.00).*

"2. That C. E. Hood, Jr., will accept the said amount in full settlement for such services rendered.

"*3. That this Contract shall not terminate until C. E. Hood, Jr., has been fully paid.*

\* \* \* \* \* \*

"Gordy Homes, Incorporated,

"By: /s/ E. S. Gordy

/s/ Chas. F. L. Hutchison
(Corporate Seal Attached)

"/s/ C. E. Hood, Jr. (Seal)"
(Emphasis supplied.)

No dividends have ever been declared by the Thomas Woods Corporation; and the possibility of its producing a profit or issuing dividends in the future is extremely remote. In May, 1958, more than five years after the contract was entered into, the plaintiff Hood brought suit upon it for the $25,000.00. The defendant, Gordy Homes, Inc., does not deny the validity of the contract but asserts that no money is due Hood thereunder unless and until it receives monies

---

1. The contract actually refers to Gordy Homes, Inc., and C. E. Hood, Jr., as The First Party and The Second Party, respectively.

from the Thomas Woods Corporation in the manner therein prescribed.

We turn to the genesis of the contract. Gordy Homes, Inc., is a Delaware corporation engaged in the construction business. Its directors agreed with a Georgia realty company to develop a housing project in Augusta, Georgia, and for this purpose the Thomas Woods Corporation was formed in 1951. Gordy Homes, Inc., and the realty company each put up one-half of the capital investment, and they received equal shares of the common stock of Thomas Woods Corporation. Construction was commenced, and Caromiss Lumber Company supplied all the lumber used in the project. The lumber transactions were between the plaintiff Hood, the managing partner in the Caromiss Lumber Company, and E. S. Gordy and Charles F. L. Hutchison, officers and directors of both Gordy Homes, Inc., and Thomas Woods Corporation.

On October 26, 1952, Hood met with E. S. Gordy and Hutchison, and they agreed to enter into the contract which was consummated in writing the following day and is here in issue. The contract, as we have seen, recites that Gordy Homes, Inc. "desires" to compensate Hood for the "valuable services" he had rendered to Gordy Homes, Inc. At the trial Hood explained these "valuable services," which relate to the Thomas Woods project, as follows:

"In trying to assist—in assisting the planning and expediting and distributing of materials, the planning of the program, consulting with Mr. Gordy about various types of lumber, helping him arrive at decisions as to whether, for example, he should use $^{25}\!/_{32}$nds or $^{3}\!/_{4}$ths sidewall sheathing, or whether he could save a substantial amount of money by using $^{11}\!/_{16}$ths board with a rough back, which on this particular job he did use and saved a very substantial amount of money * * [I]n addition, *the primary thing*, was shortly before the execution of this contract, at Mr. Gordy's request, I arranged to defer obliga-

tions of Caromiss Lumber Company that had been discounted in banks in Mississippi for him that this business was not able to pay, and which if I hadn't arranged a deferred financing for them, the project could not have been completed, in my opinion." (Emphasis supplied.)

However, Hood testified that before the October 26 conference, E. S. Gordy had never "made any definite promise" to pay Hood for these "valuable services." Hood could only state that it was his "understanding" that he would be compensated for them. Significantly, he never made demand for any compensation until after the contract was entered into.

When the contract was made construction had been substantially completed, and the Thomas Woods Corporation was in the process of converting its financing, i. e., changing the construction mortgages on the property to the permanent mortgages necessary to sell the homes to the public. Permanent mortgages could not be obtained as long as money was due materialmen who could incumber the property by filing mechanics liens. In October, 1952, Thomas Woods Corporation owed Caromiss Lumber Company approximately $25,000.00.

The deposition of Hutchison, which was introduced at the trial by the plaintiff himself gave a more detailed version of the October 26 meeting. According to him, Hood stated that he was pressed for money and desired to collect the $25,-000.00 lumber bill that Thomas Woods Corporation owed his concern, Caromiss Lumber Company. Hood proposed that Gordy Homes, Inc., should guarantee the account. This was agreeable to E. S. Gordy, provided Hood would "release the possible mechanics liens" that Caromiss Lumber Company could levy on the Thomas Woods property. Hood said that he would agree if he could obtain the permission of a certain Mississippi bank which had discounted the accounts payable from Thomas Woods Corporation to Caromiss. Gordy and Hutchison proposed to pay Hood a "premium" for

Hood's obtaining this extension of credit. In his deposition, Hutchison related the following conversation:

"'I [E. S. Gordy] tell you what I will do.' He said, 'We will guarantee that account. You release us and we will give you a bonus *out of our profit*, in the form of profits and dividends in Thomas Woods, *double or nothing*. In other words, if we can collect any money, we will give you half of it up to $25,000.00. If we don't collect any, you won't get a cent.' And Hood said, 'I am as good a gambler as you are. I will take the deal.' And that was the conception of this $25,000.00." (Emphasis supplied.)

As Hutchison explains, the proposition was advantageous to both Gordy Homes, Inc., and Hood. On the one hand, Hood had a better chance of getting paid for the lumber because Gordy Homes, Inc., was prosperous and Thomas Woods Corporation was struggling. As for Thomas Woods Corporation, it could now obtain permanent mortgaging because the threat of mechanics liens was averted.

In many respects Hood's testimony corroborates Hutchison's account of the negotiations. Hood testified that on October 26, 1952 the defendant, Gordy Homes, Inc., mortgaged its properties in another housing development to Caromiss Lumber Company as collateral security for the lumber account; that Hood at the same time agreed on behalf of Caromiss Lumber Company to release future lien claims against Thomas Woods; and that, as the "primary thing," Hood arranged for the Mississippi bank, as assignee of Thomas Woods' debt to Caromiss, to defer payment.

At the trial Hood did not attempt to refute the Hutchison version of the October 26 meeting.

Within three months Gordy Homes, Inc., paid Caromiss Lumber Company in full. However, Thomas Woods Corporation has remained in financial straits and is not likely ever to show a profit in the future or to pay a dividend. Nevertheless, Hood seeks to recover for the "valuable services" he has rendered Gordy Homes, Inc., and his reliance is upon the contract.

■■ Turning again to the contract, it will be noted that it states, "Whereas, C. E. Hood, Jr., has rendered valuable services to Gordy Homes, Inc., for which Gordy Homes, Inc., desires to compensate him in the sum of Twenty-Five Thousand Dollars ($25,000.00) *payable in the manner hereinafter set forth*," namely, one-half of the dividends received by Gordy Homes, Inc., from Thomas Woods Corporation, up to $25,000.00 (Emphasis supplied). The clear import of this language is that no duty to pay arises *under the contract* unless Gordy Homes, Inc., derives the money from the designated source, and the plaintiff cannot circumvent the unambiguous condition in the contract that he himself prepared.

We do not here decide, because it is not before us, what rights, if any, the plaintiff may have in common law assumpsit or similar action for services rendered; we pass only upon the rights and obligations of the parties under the written contract in suit.

■ Our research discloses no case in South Carolina or any other jurisdiction, nor has any been cited by the plaintiff, which holds that where a contract requires payment to be from a specified fund, the debt is payable, as the plaintiff insists, in a reasonable time even though the source fails without the fault of the promisor. Instead, the general rule appears to be as follows: "It is quite generally held, in the absence of facts or circumstances showing the contrary, that a promise which is restricted to pay out of a particular fund does not create an absolute liability." Zorn v. Sweet, 1931, 77 Utah 389, 296 P. 242, 244. See also Smith v. Boyden, 1930, 49 Idaho 638, 290 P. 377.

■ It is true that where there is a pre-existing debt and by a *subsequent* agreement payment is deferred to the happening of a specified event, it is al-

most uniformly held that the debt becomes payable within a reasonable time, if the contingent event has not occurred. See annotation, 148 A.L.R. 1077. As one writer explains, " * * * a debt which is already in existence does not or cannot change its character of absoluteness into a conditional obligation because a subsequent agreement between the parties postpones the payment of the debt until the happening of some future contingency." 148 A.L.R. 1076. In this category are cases like Nunez v. Dautel, 1873, 19 Wall. 560, 86 U.S. 560, 22 L.Ed. 161, upon which the plaintiff here mistakenly relies. Nunez executed the following paper to Dautel:

> "*Due* Joseph Dautel, or order, $1619.66, being balance of principal and interest for four years and six months' services. This we will pay as soon as the crop can be sold or the money raised *from any other source*, payable with interest." (Emphasis supplied.)

Since Nunez acknowledged that the debt in a specified amount was already due, the Supreme Court held that the "sum admitted to be due should be paid" within a reasonable time, even though the contingent event did not occur, that is, the crop had not been sold. Moreover, a clear intention was manifested that if not paid from the specified source, "any other source" could be resorted to.

Such is not the situation before us. No prescribed debt was in existence before the execution of the October 26, 1952 contract, and there is no unequivocal acknowledgement in the contract that the debt is due. Hood's own testimony reveals that prior to October 26 no promise had been made to compensate him in any amount for having assisted in the planning, expediting and distributing of materials for the Thomas Woods project. Even assuming that the contract was partly intended to compensate him for these past efforts, the evidence clearly indicates that the contract was predicated primarily on Hood's simultaneous promise to arrange an extension of credit on the lumber bill and his promise not to assert future lien claims on the Thomas Woods property. As can be seen, the agreement of Hood to perform these latter services was, unlike Nunez v. Dautel, supra, entered into contemporaneously with the contract out of which the obligation to pay arises, and the source of payment was therein specified. In such a case, it is particularly appropriate to view the extrinsic circumstances to determine whether the parties intended the debt to be absolute or conditional. 12 Am.Jur., Contracts, Sec. 301, p. 856; L.R.A.1917B, p. 1054, note 6.

■ The testimony of the parties and the surrounding circumstances convincingly show that Gordy Homes, Inc., did not agree unconditionally to pay a sum certain but that the described method of payment was intended as the condition precedent to Hood's satisfaction under the contract. Charles F. L. Hutchison, a co-signer of the contract for Gordy Homes, Inc., stated in his deposition that it was agreed that the $25,000.00 would be paid to Hood only in the event that money would be forthcoming from Thomas Woods Corporation. That this was the intention of the parties is borne out by three factors. First, Hood did not attempt at the trial to refute, or even mention, Hutchison's account of the events of the October 26 meeting. Second, the outlook for success of the Thomas Woods project was dim in 1952, and it is not likely that Gordy Homes, Inc., would have agreed, in addition to guaranteeing the lumber account of Thomas Woods Corporation, to pay also the generous sum of $25,000.00 unless the project would in time become profitable. Third, Gordy Homes, Inc., within three months after execution of the contract, paid Hood in full the money Thomas Woods Corporation owed on its lumber account. Thus, Hood, having received his profit on the lumber sales, has been compensated to a large extent for his services rendered; and while, in the language attributed to him, he was willing to gamble on a larger return upon an uncertain contingency, he cannot now broaden his claim after he has "taken a flier" and it has failed to materialize.

Finally, the plaintiff contends that the condition of payment is nugatory because Gordy Homes, Inc., did not in fact own one-half of the stock of Thomas Woods Corporation when the contract was entered into. It is true that Gordy Homes, Inc., in September, 1952, one month before the contract, transferred most of these shares to E. S. Gordy, Ralph E. Gordy and Hutchison, the principal stockholders of Gordy Homes, Inc. No bad faith is asserted or proved, and in any event, this is inconsequential, for in December, 1955, the stock was retransferred to Gordy Homes, Inc., which continues to hold it; and no dividends were declared in the interim to prejudice the plaintiff.

We conclude from the unambiguous wording of the contract, which is fortified by testimony and circumstances indicating the intention of the parties, that the plaintiff is entitled to recover nothing under the contract until Gordy Homes, Inc., receives monies from the Thomas Woods Corporation in the form of "dividends or profits."

The District Court's dismissal of the suit without prejudice is

Affirmed.