**UNITED STATES of America**

v.

**BETHLEHEM STEEL COMPANY.**

Civ. A. No. 12888.

United States District Court
D. Maryland.
Feb. 13, 1962.

Joseph D. Tydings, U. S. Atty., and Herbert Pittle, Washington, D. C., for plaintiff.

David R. Owen, and Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

WINTER, District Judge.

The United States of America (Government) seeks a declaratory judgment against Bethlehem Steel Company (Bethlehem) to construe a contract between them, executed as of August 15, 1941, but actually signed January 23, 1942 (the Contract), and to determine the legal effect of certain acts of the parties thereunder,[1] The Contract, negotiated and executed contemporaneously with the outbreak of World War II, provided for (a) the construction by Bethlehem of ship-repair facilities for the Navy Department (the Facilities), with reimbursement by the Government, on a site adjacent to Bethlehem's Key Highway Yard, Baltimore, Maryland, to be furnished to Bethlehem by the Government, (b) the use and occupancy of the Facilities by Bethlehem for the performance of private and Government ship-repair contracts, (c) the rent to be paid by Bethlehem, and (d) Bethlehem's right to purchase the Facilities, and the price to be paid therefor.

The controversy between the parties stems from the construction to be afforded "ART. 14. OPTIONS OF CONTRACTOR AND GOVERNMENT," which, so far as relevant, provides:

"(a) At any time, and from time to time, prior to the termination or expiration of the Stand-by Period, the Contractor, if it desires to purchase the Facilities, may request the Department to obtain a determination of the purchase price thereof. Within thirty (30) days after the receipt of any such request by the Department, the Navy Compensation Board shall certify such purchase price to the Department and to the Contractor. The price so certified shall be equal to the Acquisition Costs of the Facilities [undiminished by any revision under Article 11(a) (i) hereof] less depreciation on each item of the Facilities at the rate of six percent (6%) per annum from the date upon which such item was installed and available for use, to the date of the Contractor's request for the determination made hereunder, [and less the costs as determined by said Board of all repairing, reconditioning, rebuilding or replacement of items of the Facilities, or parts thereof, which the Department shall not have authorized or directed to be done under Article 11(a) (i) hereof:] *Provided, however,* That such price shall never be less than fifteen percent (15%) of the Acquisition Costs of the Facilities. The Contractor, for a period of thirty (30) days from the receipt of any such certification, shall have the right to purchase the Facilities at the price so certified, by making a payment to the Government of an amount equal to such price, or by giving notice to the Department of its election to purchase the same at such price and entering into a contract with the Government specifying the terms of such purchase: * * *."[2]

After abortive negotiations for the purchase of the Facilities in 1952–1953,

---

1. Jurisdiction is grounded upon the fact that the United States of America is the plaintiff, 28 U.S.C.A. § 1345. 28 U.S.C.A. § 2201 gives the Court authority to "declare the rights and other legal relations of any interested party * * *," in those cases where there is an "actual controversy" between the parties.

2. By Amendment No. 5 to the Contract, dated April 2, 1945, the bracketed portions of Art. 14 were deleted.

the Government, by letter dated August 9, 1957, advised Bethlehem of the former's interest in selling the Facilities. Bethlehem, by its letter dated August 15, 1957, replied that it desired to purchase them and requested a determination of the price in accordance with Art. 14. The Government, after first determining that it lacked the authority to perform in accordance with the terms of the option,[3] completely reversed its position and, on July 2, 1958, certified to Bethlehem a price of $781,660.72. This price was based upon the depreciated acquisition cost of the Facilities, determined as of May 15, 1958, *except land,* with the land included at its original acquisition cost. Bethlehem declined to pay this price because it contended that the proper price under the option was depreciated acquisition cost, *including the cost of land,* determined as of August 15, 1957, the date of Bethlehem's letter stating its desire to purchase. Bethlehem's computation of the correct purchase price was $477,207.00.

Bethlehem paid rent to and including September 14, 1957, but failed and refused to pay rent thereafter,[4] whereupon the Government, by its letter dated May 1, 1959, purportedly terminated the Contract and asserted its right to recover a fair and reasonable rent, greater than that specified in the Contract.[5] Indeed, the Government withheld payments to Bethlehem, due it under other and unrelated contracts, as an offset against Bethlehem's alleged liability for unpaid rent, although these funds were released prior

to the hearing, so that there no longer exists a justiciable controversy between the parties as to the legality of the Government's withholding, aside from Bethlehem's claim, if any, for interest during the period of withholding. It is conceded that the latter is not now before the Court.

The Government requests judgment of the Court, declaring and determining that the option price specified by Art. 14 was the sum of the depreciated acquisition cost of the Facilities, except land, and land at its undepreciated acquisition cost, determined as of May 15, 1958; Bethlehem contends conversely as to the depreciation of land and the date as of which the option price should be determined.[6] The Government also seeks a declaration that Bethlehem is liable for the rent specified in the Contract from September 15, 1957 until May 1, 1959, and rent based upon "reasonable value of the use and occupancy of the Government's property thereafter," claimed to be $12,000.00 per month, with interest, and, implicit in the latter, a determination that Bethlehem breached the Contract, thus giving the Government the right to terminate it and escape the lesser rent prescribed by Art. 10.

The Contract itself provides a definition of the word "Facilities" in the third recital, preceding a statement of the mutual covenants and agreements between the parties, by defining the word to mean the items specified in Schedules 1 and 2 attached to the Contract.[7] In turn Schedule 1, designated as the Facilities

3. A precise disclosure of the basis for the Government's first determination is not made in this record. Apparently the problem raised was whether Art. 14 had been superseded by § 203 of the Federal Property and Administrative Services Act of 1949, as amended, first codified as 41 U.S.C.A. § 233 and subsequently transferred to 40 U.S.C.A. § 484.

4. Bethlehem's theory was that the Government should have certified the correct price within thirty (30) days from August 15, 1957, and from that date forward Bethlehem ceased to be a tenant and became a contract purchaser or an equitable owner.

5. The rent specified in Art. 10 of the Contract is in the nature of a gross receipts rent. Although subject to variance, it averages less than the $12,000.00 "fair and reasonable" monthly rent claimed by the Government.

6. Should Bethlehem's measure of value be rejected but date of valuation be adopted, the Government has certified an option price less than the amount to which it was entitled.

7. "WHEREAS, the Secretary has determined that, in the national emergency declared by the President on September 8, 1939 and May 27, 1941 to exist, the

to be furnished by the Government, lists two items: site (three tracts of land, including two marine railways thereon) and special contingency for acquisition of site. Thus, if the Court's determination is limited to a consideration of the Contract, the conclusion seems inescapable that Art. 14, in prescribing the option price as the acquisition costs of the Facilities, less depreciation, is operative as to each item of the installation, *including land*.

This surface and apparent meaning of the word "Facilities" as used in Art. 14 is reinforced by a consideration of other portions of the Contract. Art. 1(b) imposed on the Government the obligation to acquire the Schedule 1 Facilities "as soon as practicable" and furnish them to Bethlehem. Since land and improvements thereon were the only items to be furnished by the Government, "Facilities" as used in Art. 1(b) certainly meant land. Art. 5 reserved title to the Schedule 1 Facilities in the Government. The fact of this litigation shows that the Government treats Art. 5 as reserving its title to land. More significantly, Art. 8 (d) required the Government to certify "Acquisition Costs" of the "Facilities" when they had been determined. In compliance, the Government certified land at $365,630.31 and cost of survey at $1,766.31.

Art. 10, which related to Bethlehem's use of the Facilities and its obligation to pay rent therefor, also made it perfectly plain that the word "Facilities" was meant to include land, and that the rent to be paid was for the use of the land, as well as for the structural improvements erected thereon.

When the parties have defined a term in an agreement between them, and have obviously used that term in accordance with the definition in many portions of the agreement, a strong showing is required to establish that a different meaning of the defined term was intended in another portion of the agreement which on its face makes no exception to the general meaning. However, the Government contends that the plain and literal meaning of Art. 14 does not obtain, because the Contract does not "clearly express the intention of the parties," is "ambiguous," and its meaning is "doubtful." To support this argument and to avoid the plain and literal meaning, the Government points to the phrase in Art. 14, which states that depreciation commences from the date "upon which such item was installed and available for use" and argues that land was not "installed and available for use;" hence, there is an ambiguity is Art. 14 apparent on the surface. The latter argument is without merit when some of the interpretive evidence presented to the Court is recited.

It was shown at the hearing that the site furnished Bethlehem by the Government consisted of three privately-owned shipyards, acquired by the Government by condemnation.[8] These yards were used for building and repairing harbor boats. On one there were several marine railways. On all three yards, the underwater land was gently sloping and the antithesis of the berthing space needed by Bethlehem, i. e., high land and deep water. As a consequence, of the approximately one hundred thousand square feet of fast land, there remained, after construction, approximately forty-five to forty-seven thousand square feet of fast land,[9] the level of the fast land had been raised, and there were constructed two

---

public exigency requires that *the items specified in Schedules 1 and 2 attached hereto (hereinafter called the 'Facilities')* be provided, and that all the Facilities other than the marine railways included among the Schedule 1 Facilities be located adjacent to the Contractor's Baltimore yard at 1101 Key Highway, Baltimore, Maryland, so as to enable the Contractor to perform contracts with the Government or others;" (Italics supplied)

8. In condemnation, the Government paid an aggregate of $365,630.31, the exact amount certified to Bethlehem as the "Acquisition Cost."

9. Stated otherwise, it was stipulated that Bethlehem was furnished approximately 7 acres of land, of which 2.9 acres were

finger piers. In the light of such extensive dredging and construction, it can hardly be said that the words "installed and available for use" are inapt as applied to the site furnished Bethlehem by the Government.

In an effort to show that the Contract did not reflect the intention of the parties, was ambiguous, and doubtful in meaning, the Government offered evidence of the negotiations leading up to the execution of the Contract. At the outset, it should be said that the Government's proof was hampered by the fact that the majority of official files had heretofore been destroyed in the normal course of events and, hence, the Government's proof was fragmentary and incomplete.

Negotiations between the parties were conducted from August, 1941 to January 23, 1942. The Government was represented by Captain, then Commander, Philip Lemler, of the Bureau of Ships, and by then Lieutenant Commander T. M. Davis and Richard B. Whittredge, legal officers in the Department of the Navy, while Bethlehem was represented by A. James Slater, who was then Assistant Secretary of the Company. Bethlehem had one or two other negotiators, whose duty it was to report to Mr. Slater.

Captain Lemler, Commander Davis and Messrs. Whittredge and Slater, all testified before the Court, in person or by deposition. No one had any direct recollection of how or why Art. 14 was finally cast in the form in which it appears in the Contract. It was shown that at the time negotiations were commenced, Mr. Slater prepared a memorandum setting forth a proposed contract and delivered it to the Navy, which provided in regard to the Facilities, *inter alia*, that Bethlehem would have the option to purchase the land and all of the Facilities at *any yard* at original cost less depreciation at certain named rates, *excluding any rate for land*. Thus, it would appear the purchase price for land would have been undepreciated original cost. A form of proposed contract printed by Bethlehem was admitted into evidence, and this form provided for an option on the part of Bethlehem substantially as set forth in the memorandum.[10]

The record is clear that usually the Navy insisted that its form of agreement be adopted. About the middle of 1941, when the Navy was engaged in an ambitious program in the interest of national defense to expand ship-repair facilities, the Navy used a standard contract form, identified by the symbol "NOd." This form had been developed for shipbuilding facilities, as distinguished from ship-repair facilities. The "NOd" type contract was used as a base for the drafting of ship-repair contracts by marking it up to fit the special needs of a particular case.

Subsequently, a new form of contract, known as the "NObs" contract, was prescribed as the standard, and apparently the Contract was the first of the new type to be executed. The standard "NObs" contract provided alternate forms for Art. 14(a)—the first permitting the Contractor to purchase facilities at fair value, as determined by the Secretary of the Navy, and the other permitting the Contractor to purchase facilities at acquisition costs, less depreciation.[11] It was substantially the latter which became Art. 14(a) of the Contract.

In addition to the Slater memorandum and the Bethlehem printed draft of the proposed contract, the Government also

---

fast land, the balance being submerged. Approximately 1.4 acres of fast land were forthwith removed by dredging.

10. There was testimony that contracts of this nature were always printed by the Government Printing Office, but when it had a backlog of orders, Bethlehem was permitted to use its private, speedier printing facilities.

11. "ART. 14. OPTIONS OF CONTRACTOR AND GOVERNMENT

"[Contractor must elect one form of paragraph (a).]

"(a) At any time or times prior to the termination or expiration of the Standby Period, the Contractor, if it desires to purchase the Facilities, may request the

proved an "Estimate of Depreciation" study, prepared by Percy H. Wilson, of the Bureau of Ships. There was testimony that it was Mr. Wilson's function to make a preliminary estimate of depreciation on each item to be constructed, so as to arrive at a composite figure to serve as a basis for negotiation with contractors, the composite figure finally agreed upon to be inserted in "NObs" type contracts (see blank space in footnote 11). Mr. Wilson's study indicates that he did not consider any depreciation rate for land, and the composite figure representing the arithmetical average of the various rates of depreciation which he used ranging from 4% to 20%, was 6%, which he arbitrarily increased to 7.5%.

Additionally, the Government showed that it and Bethlehem were negotiating similar contracts for ship-repair facilities at Bethlehem's other yards, including East Boston, Massachusetts, Hoboken, New Jersey, San Francisco, California and San Pedro, California, although these contracts were executed later than the Contract. All of these contracts gave Bethlehem an option to purchase the Facilities, but each provided that the purchase price should be determined by the sum of depreciated acquisition cost, exclusive of land, and land at its fair value.

The Contract was executed on January 23, 1942. On that date it was submitted to and approved by five of the Navy's personnel, who had negotiated and prepared the Contract, and seven corrections to the Contract were made. However, no corrections were made to Art. 14.

Much of the testimony and Government Exhibits 2 to 22, both inclusive, were objected to by Bethlehem. Specifically, the testimony of the witnesses Lemler, Davis and Whittredge, except with respect to the fact of execution of the Contract, was objected to. The objections were overruled and the testimony permitted, and exhibits admitted, without prejudice to a subsequent motion to strike. At the conclusion of the case, such a motion was made and ruling thereon reserved.

Secretary to determine their then fair value. The Secretary within ninety (90) days after the receipt of such request, shall determine such fair value, and in making such determination shall give due regard to the original cost of the Facilities, the extent of their prior use, the amount of depreciation and obsolescence chargeable against the Facilities, the value of the Facilities to the Contractor, the replacement cost, and all other facts and circumstances which he may deem relevant. Upon the completion of such determination, the Secretary shall notify the Contractor of the fair value so determined, and the Contractor for a period of thirty (30) days from the receipt of such notification, and for such additional period if any as may be allowed by the Secretary, shall have the right to purchase the Facilities for a sum equal to such fair value, by making a payment to the Government of an amount equal to such fair value, or by giving notice in writing to the Department of its election to purchase the same at such fair value and entering into a contract with the Government specifying the terms of such purchase:
\* \* \*

"(a) At any time or times prior to the termination or expiration of the Stand-

by Period, the Contractor, if it desires to purchase the Facilities, may request the Department to obtain a determination of the purchase price thereof. Within thirty (30) days after the receipt of such request by the Department, the Navy Compensation Board shall certify such purchase price to the Department and to the Contractor. The price so certified shall be equal to the Acquisition Costs of the Facilities, less depreciation on each item of the Facilities at the rate of ____ per cent ( :%) per annum from the date upon which such item was installed and available for use, to the date of the Contractor's request for the determination made hereunder: *Provided, however*, that such price shall never be less than fifteen percent (15%) of the Acquisition Cost of the Facilities. The Contractor, for a period of thirty (30) days from its receipt of such certification, shall have the right to purchase the Facilities at the price so certified, by making a payment to the Government of an amount equal to such price, or by giving notice in writing to the Department of its election to purchase the same at such price and entering into a contract with the Government specifying the terms of such purchase: \* \* \*"

■■ The motions to strike must be granted, because the Contract is so plain and unambiguous on its face that, except for interpretive evidence to demonstrate the propriety of the use of the phrase "installed and available for use," any other evidence, short of evidence to show fraud or mutual mistake, violates the basic concept that the parties are bound to what, by their plain and unequivocal language, they contracted to do. Under such circumstances, the refusal by a court to receive such evidence is justified by application of the parol evidence rule. That the parol evidence rule is firmly fixed as the law of this circuit is demonstrated by Rock-Ola Manufacturing Corp. v. Wertz, 282 F.2d 208 (4 Cir., 1960); Grombach Oerlikon Tool & Arms Corp., 276 F.2d 155 (4 Cir., 1960); Meinhard, Greeff & Co. v. Brown, 199 F.2d 70 (4 Cir., 1952); Vlavianos v. The Cypress, 171 F.2d 435 (4 Cir., 1948).[12] Equally clear is approval of the use of interpretive evidence such as that permitted in the instant case, Hood v. Gordy Homes, Incorporated, 267 F.2d 882 (4 Cir., 1959); E. I. DuPont De Nemours & Co. v. Lyles & Lang, Const. Co., 219 F.2d 328 (4 Cir., 1955), cert. den. 349 U.S. 956, 75 S.Ct. 882, 99 L.Ed. 1280 (1955); Atlantic Greyhound Corp. v. Smithdeal, 192 F.2d 453 (4 Cir., 1951), cert. den. 343 U.S. 928, 72 S.Ct. 761, 96 L.Ed. 1338 (1952). The parol evidence rule is discussed and the divers cases applying it collected in McCormick, Evidence (1954 Ed.), Ch. 24; 9 Wigmore, Evidence (3rd Ed., 1940), § 2400, et seq.; 3 Williston, Contracts (Rev. Ed. 1936), §§ 637–644; 3 Corbin on Contracts (1960 Ed.), Chs. 24, 26.

The parol evidence rule has been criticized because, as succinctly stated by Hammond, J., in Glass v. Doctors Hospital, 213 Md. 44, 58, 131 A.2d 254, 261 (1957), " * * * the definition of it may assume what must be determined in deciding whether it is operative." Judge Hammond is quite correct in stating that the application of the parol evidence rule requires at least preliminary consideration of the evidence, and a consideration of its weight to determine whether it is sufficiently material and credible to vary or contradict the written instrument that supplanted and nullified it; and, in concluding that the parol evidence rule requires the striking of the evidence challenged by Bethlehem, the Court has followed this process. Of necessity, therefore, the determination that the parol evidence rule does apply is also a determination that even if the evidence is admitted, the Government has not proved that the Contract between the parties gave Bethlehem an option to purchase land at something other than depreciated acquisition cost.

■ A short recital of the evidence on which the Government relies will point up its lack of persuasiveness. It is, of course, true as the Government contends that land in the physical, accounting or tax sense does not depreciate, Bivans v. Utah Lake Land, etc., Co., 53 Utah 601, 174 P. 1126, 1130 (1918); Hoboken Land Improvement Co. v. Com'r of Int. Rev., 138 F.2d 104 (3 Cir., 1943); State ex rel. City of St. Louis v. Public Service Commission, 341 Mo. 920, 110 S.W.2d 749, 767 (1937), but it is equally true that the concept of depreciation as employed in Art. 14 is nothing more than an agreement between the parties as to a future purchase price and, hence, the Government's citations are not controlling.

■ The record of the negotiations between the parties and the emergence of the executed Art. 14 is so spotty and incomplete that it fails to prove a different agreement between the parties, other than that apparent on the face of Art. 14. The fact that Bethlehem made a different proposal early in the negotia-

12. Since the parol evidence rule is a rule of substantive law, in diversity cases, the State parol evidence rule is applied, Rock-Ola and Grombach, supra. Where there is not diversity, as here, the Federal parol evidence rule is applied, United States v. Morgan, 196 F.Supp. 345 (Md. 1961), aff'd per curiam 298 F.2d 255 (4 Cir., 1962); Meinhard and The Cypress, supra.

tions, and even printed a draft of contract providing for purchase of land in accordance with its proposal, is not compelling, because it is not at all unusual for early negotiations leading to the formation of a contract to be quite different from the ultimate agreement reached.[13] In this connection, it is not without significance that Mr. Wilson's depreciation study, on which the Government relies in part, would have indicated a depreciation rate of 7.5%, while the rate actually embodied in the executed Art. 14 was 6%. The further fact that the parties entered into contracts containing different options for other facilities proves no more that there was mistake in the Contract as in substance the Government contends than that the parties, when they desired to express a different result, were capable of choosing proper language.

From what has been said, the Court will enter a declaration that by virtue of Art. 14 of the Contract, Bethlehem was entitled to purchase the Facilities for the sum of $477,207.00, representing depreciated acquisition cost, including land.

The questions next to be considered are Bethlehem's liability for rent on and after September 15, 1957, and the legal effect of the Government's purported termination of the Contract on May 1, 1959. These questions arise against this additional factual background.

By letter dated August 9, 1957, the Government, acting through the Department of the Navy, Bureau of Ships, advised Bethlehem that it desired to sell its facilities located adjacent to Bethlehem's Key Highway Yard, which were the subject of Contract NObs–72, and requested Bethlehem to advise whether it desired "at this time" to purchase said facilities in accordance with the provisions of Article 14. Bethlehem replied, by letter dated August 15, that it " * * *

desires to purchase the Navy-owned facilities at our Baltimore Yard * * *." The letter further stated, "We, therefore, should appreciate your taking prompt steps to determine the purchase price thereof in accordance with Article (14) of this contract." Indeed, earlier, by letter dated May 31, 1956, Bethlehem had advised the Government that, " * * * its present intention is to exercise the option in Article 14 of Facilities Contract NObs–72 to purchase the Government-owned facilities at the Baltimore Yard when the acquisition cost of the facilities is depreciated to 15% of the original acquisition cost." Bethlehem paid rent to and including September 14, 1957 and refused to pay rent thereafter. Art. 10 of the Contract is silent as to when Bethlehem's liability for rent shall cease. Bethlehem's refusal was the basis for the Government's purported termination of the contract on May 1, 1959, the beginning date for the "fair and reasonable" rent claimed by the Government, in the amount of $12,000.00 per month.

Art. 14 gave to Bethlehem the option to purchase the Facilities by making a request to the Government to obtain a determination of the purchase price thereof. In addition to specifying the formula by which the purchase price should be determined, Art. 14 required the Government to certify the price to Bethlehem within thirty (30) days and, thereafter, Bethlehem was given thirty (30) days in which to purchase the Facilities by making payment of the amount so certified, or by giving notice of its election to purchase, and entering into a contract specifying the terms thereof. The latter obviously contemplated that Bethlehem might purchase on a deferred payment basis, or on some basis other than unqualified payment in full in cash.

The Government contends that Bethlehem never properly exercised its right

13. Indeed, there was testimony that, with respect to "scrambled" facilities, i. e., facilities owned in part by Bethlehem and in part by the Government, like the Bethlehem Key Highway Yard, Bethlehem was prepared to agree to any form of option under which it would have the right at a future date to acquire the outstanding interests in the Government, and in this way "unscramble" the facilities.

to acquire the Facilities under Art. 14, because it never tendered either the amount of the certified price, or, if Bethlehem's concept of the correct purchase price was correct, the amount of Bethlehem's price; hence, Bethlehem remained a tenant in possession and liable for rent, and nonpayment of rent constituted a legal basis for the Government's termination of the Contract. Bethlehem contends that, factually, it did tender the sum of $477,207.00, and it was shown that the Board of Directors of Bethlehem, at its meeting held March 29, 1957, authorized the acquisition of the Facilities, and made available funds at and for an amount not exceeding $480,000.00. At a meeting in July, 1958, representatives of the Navy were orally advised that Bethlehem had "authorized the acquisition of the facilities and had appropriated the money to buy it, and in a letter dated July 21, 1958, written shortly thereafter, Bethlehem advised the Government, *inter alia*, that (a) its desire to purchase was unchanged, (b) the Board had authorized the expenditure and provided the funds, (c) it was prepared to pay $477,207.00 whenever "you wish to accept it," and (d) it was not enclosing payment because of the Government's oral advice that it did not wish to accept payment. At subsequent meetings, on November 17, 1958 and December, 1958, and thereafter, Bethlehem repeated its offer to pay $477,207.00. Admittedly, Bethlehem never tendered a check and it would not have done so until the Government was prepared to deliver a deed. The Government claims that the failure to tender a check, and the additional fact that the various oral offers were transmitted in part to persons who did not have the status of "contracting officers," and, hence, were not authorized to bind the Government, rendered the legal effect of Bethlehem's offers nugatory. The Government makes this contention notwithstanding that in the light of the Government's outstanding certification of July 2, 1958, over the signature of Rear Admiral L. V. Honsinger, of the $781,660.72 price, it would be difficult to conceive of a more futile act than a tender of $477,207.00.

■ There can be little question that if Bethlehem validly exercised its option in Art. 14, it would have ceased to be a tenant and would have become a contract purchaser without liability for further payment of rent, because its leasehold interest would have merged into the greater estate, 3 Thompson, Real Property (Perm.Ed.1940) § 1332; 1 American Law of Property (1952 Ed.), § 3.84; Cities Service Oil Co. v. Viering, 404 Ill. 538, 89 N.E.2d 392, 13 A.L.R.2d 1448 (1949); Master v. Roberts, 244 Pa. 342, 90 A. 735 (1914); Knerr v. Bradley, 105 Pa. 190 (1884). See also: Rosenthal v. Shapiro, 333 Mich. 302, 52 N.W.2d 859 (1952). The Government however, contends that in order for this principle of law to be applicable it must appear that, factually, the option was exercised and, since an option may be exercised only in accordance with its terms, the failure to tender the amount makes the purported exercise legally ineffective, citing as authority United States v. T. W. Corder, Inc., 208 F.2d 411 (9 Cir., 1953); Cumming et al. v. United States, 57 Ct.Cl. 551 (1922); Hart v. California Pacific Title & Trust Co., 136 F.2d 430 (9 Cir., 1943); Annotation 101 A.L.R. 1432 (1936).

■ While Art. 14 requires the successive steps of (a) request by Bethlehem for certificate of price, (b) certification by the Government of price, and (c) exercise of option by Bethlehem by payment of certified price or execution of contract specifying terms of purchase, the correspondence between the parties referred to above demonstrates that (a) was fully performed by Bethlehem, and at least so much of (c) as relates to explicit or implicit notice of election to purchase was also complied with by Bethlehem. The part of (c) which requires either actual payment or execution of a contract specifying payment was not complied with by Bethlehem; but the Court finds, in view of Bethlehem's August 15, 1957 letter, the Board of Directors' authorization on March 29, 1957,

and the repeated oral statements and offers to representatives of the Government during 1958, and thereafter, such noncompliance was the direct result of, and caused by, the Government's self-imposed inability to perform its obligations under Art. 14, which continued from August 15, 1957 to July 2, 1958, and thereafter the Government's further failure to comply with the terms and provisions of Art. 14 in reference to certification of the purchase price as herein determined. Thus, the Government's two successive breaches of the Contract prevented performance of the Contract by Bethlehem.[14] Short of the unequivocal commitment of a tender, Bethlehem took every reasonable step possible to bring itself in full compliance with Art. 14.

■ It, therefore, becomes unnecessary to decide whether Bethlehem's every reasonable effort mounted up to a tender sufficient to satisfy Art. 14 because, factually, it is clear that Bethlehem's inability fully to perform was prevented by the Government and, legally, Bethlehem would be excused from any failure fully to perform.

The New York Court of Appeals, in Rockland-Rockport Lime Co. v. Leary, 203 N.Y. 469, 97 N.E. 43, L.R.A.1916F, 352 (1911), clearly stated the applicable rule of law here, in a case where the option required notice and tender by the lessee, but where, after the lessee gave notice, the lessor refused to convey. The court excused the lack of tender, saying (97 N.E. p. 47):

"Where, according to allegation and evidence, one party is able and will-

ing to perform and has made due effort to that end, no actual tender need be made if performance has been prevented by the other party * * *."

To the same effect, under similar facts, is Fiers v. Jacobson, 123 Mont. 242, 211 P.2d 968 (1949), where a tender was described as "an idle and useless act," as is Sinclair Refining Co. v. Clay, 102 F. Supp. 732 (N.D.Ohio 1951), aff'd. 194 F.2d 532 (6 Cir., 1952), where the District Court said (p. 735):

"Since at no time has lessor ever offered to carry out her duties under the lease, she cannot now say that the plaintiff should be denied relief because it did not tender the purchase price."

■ The cases hold that where there has been an effective exercise of an option by the purchaser's giving proper notice, followed by a delay on the part of the seller in consummating the transaction, the seller may not recover rent for the intervening period, viz.: Cities Service Oil Co. v. Viering, supra, where the landlord was denied rent for the period after notice of the exercise of the option during which he was unable to perform because of his wife's refusal to release her dower, as well as Master v. Roberts, supra, Knerr v. Bradley, supra, Pabst et al. v. John P. Dant Distillery Co., Inc., 169 F.2d 168 (6 Cir., 1948) and Murfee v. Porter, 96 Cal.App.2d 9, 214 P. 2d 543 (1950). The latter two are particularly applicable here, because in each the landlord's failure to perform stemmed from his efforts to obtain a greater sum

---

14. The Government contends that its failure to certify any purchase price for 10½ months did not constitute a material breach of the contract, because the Contract did not provide that time was of the essence, the negotiations leading to the execution of the Contract indicated that the parties never contemplated that time should be of the essence, Bethlehem has remained in possession for more than four years since it gave notice of its intention to purchase, Bethlehem has had the use of the $477,207.00 which it claims represents the correct purchase price since the date on which Bethlehem contends the

price was payable, and Bethlehem has by its many negotiations, since September, 1957, designed to persuade the Government that its self-imposed limitation was incorrect, and that the proper purchase price was $477,207.00, has "waived" any complaint attributable to the Government's delay. No authority is cited in support of the Government's argument. Even treating the Government's failure to perform until July 2, 1958, as completely bona fide, although erroneous, the Court deems all these arguments lacking in merit.

than the option price. This Court holds that where the seller prevents effective exercise of the option, he is entitled to no greater recovery for rent.

The Court will also enter a declaration that Bethlehem's liability for rent ceased on and after September 15, 1957, and that the Government's purported termination of the Contract on May 1, 1959, was void and of no effect.

If counsel desire additional findings of fact, they may submit requests therefor within ten (10) days. Thereafter counsel may submit an appropriate order.