## GLASS *v*. DOCTORS HOSPITAL, INC.

[No. 145, October Term, 1956.]

46

48

*Decided April 10, 1957.*

*Motion for rehearing filed and denied May 10, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Benjamin Lipsitz,* with whom were *Hilary W. Gans* and *Gerald E. Topper* on the brief, for the appellant.

*Paul M. Higinbothom* and *Melvin J. Sykes,* with whom were *Emanuel H. Horn* and *William C. Higinbothom* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

Dr. Louis Glass, the appellant, founded, and for some time controlled, Doctors Hospital, Inc., a non-stock corporation, the appellee. In late 1954, the board of trustees which for some years had managed the hospital in accordance with the direction of its charter, terminated Dr. Glass' privilege to practice there as of January 1, 1955. He filed a bill against the hospital, seeking declarations that his dismissal was of no effect, that he is a permanent member of the non-stock corporation with all of the rights and privileges of a member, including the right to practice at the hospital, and asking that the trustees be enjoined from depriving him of his rights as a member of the medical staff.

After consideration of testimony produced at a trial that lasted three weeks and of one hundred exhibits, the chancellor, in an able opinion, denied Dr. Glass any relief, and dismissed his bill.

The evidence shows that Dr. Glass and his brother were engaged in the practice of medicine in Baltimore, while at the same time carrying on a very active real estate business. In 1938 they purchased property on Washington Boulevard, which they used as their offices and as a small hospital. The brother then went into the military service. In 1941, Dr. Glass with some associates incorporated Doctors Hospital, Inc., as a non-stock corporation. In 1943 title to the Washington Boulevard property was transferred to the corporation, which thereafter paid rent to the brothers. From 1938 to 1947, the hospital was financed by the Glass family and

managed by Dr. Louis Glass exclusively. The board of trustees consisted largely of the Glass family.

In 1944, Doctors Hospital, Inc., bought property in the 2700 block of North Charles Street from the Maryland Academy of Sciences, intending to convert it into a hospital. Seemingly, because outside capital could not be attracted to a non-profit corporation, Dr. Glass caused to be formed a stock corporation, known as Doctors Hospital of Maryland, Inc. All of its capital stock was subscribed and paid for in cash and other valuable considerations by the Doctors Glass and three other doctors, but the certificates were never issued. A deed for the Charles Street property was executed to the new corporation but never recorded. The present hospital building was constructed on the Charles Street property with capital funds and the proceeds of a mortgage on the property in accordance with Dr. Glass' plans and under his personal supervision. It was decided then that Doctors Hospital, Inc., should run the institution and it did so from the time it began operations on Charles Street in 1947. Dr. Glass organized the medical staff, appointed the heads of departments, gave out privileges and was personally in control of all operations. Almost immediately it was thought necessary to acquire membership in the Maryland Hospital Association, commonly known as Blue Cross. It was learned that this could not be done if the hospital was operated by those who controlled it financially. Doctors Hospital of Maryland, Inc., transferred all of its assets to Doctors Hospital, Inc., and was thereafter dissolved. Dr. Glass' testimony is that as part of the arrangement by which Doctors Hospital, Inc., acquired assets of the stock corporation, it assumed all obligations, and that he and another doctor were given permanent rights to be members of the hospital and of its staff. In 1948, a second mortgage was executed from Doctors Hospital, Inc., to Dr. Glass and his wife and others, in the sum of $200,000, representing all monies advanced by anyone who had contributed in any way to the construction of the hospital building, including, as the chancellor found, amounts paid for the stock of the stock corporation. One

hundred thousand dollars is stated in the mortgage to be owing to Dr. Glass and his wife.

The hospital then sought accreditation from the Baltimore City Medical Society, acting as agent for the American Medical Association. A survey committee advised the hospital of its finding that the board of directors was too small and should be expanded to fifteen members, with backgrounds of public service and with no previous business affiliations with the hospital or its staff. Dr. Glass, his brother, and two other directors resigned from the board and new members were elected in their places. Dr. Glass was appointed administrator of the hospital. He continued to be the dominant force in its operation, and the board, from time to time, found it necessary to remind him that it was the governing body to whom he was responsible. In 1950, the Baltimore City Medical Society suggested that Dr. Glass should not be the executive officer of the hospital because he was on the staff and because the hospital was heavily obligated to him financially. Pursuant to this recommendation, Dr. Glass, in 1951, resigned as administrator and was appointed "Hospital Consultant". In 1951, Mr. Sokol, a lawyer of Baltimore, became a member of the board and friction between Dr. Glass and the board increased acutely, chiefly because he was unwilling really to relinquish control of the hospital and to face up to the realization that its affairs were to be in fact as well as in legal theory, managed and controlled by the trustees, so that he could no longer treat and manage the hospital as if it were his personal creature. As the chancellor put it: "Behind this skeletal history loom conflicts of personality and battles for administrative control of the hospital in whose formation, indubitably, the plaintiff played the major part. * * * Through his efforts and the efforts of the members of the Board of Trustees and the staff, the hospital today has attained a real place in Baltimore's roster of medical institutions. It has over eighty beds for patients; its staff numbers between 150 and 200 physicians and dentists; it has approximately seventy-five employees; it is registered by the American Medical Association and the American Hospital Association, and provisionally accredited

by the Joint Commission on Accreditation of the American Medical and American Hospital Associations. It was included among the Baltimore hospitals to which, after investigation, the Ford Foundation recently awarded grants. It is unique in Baltimore in that the great majority of the members of its staff are general practitioners. As to the institution, the plaintiff's ambition has been realized, but in the process his own connection with it has been terminated. In his eyes, like Frankenstein, the creature to which he gave life has turned upon him."

The plaintiff's efforts in a court of equity to regain his place on the medical staff of the hospital are grounded on the following contentions: (1) the appellee is a private corporation with members in addition to, and apart from, the board of trustees, and the doctor, despite his resignation from the board, is still a member whose corporate rights and privileges have been violated by the refusal to renew his medical privileges; (2) the corporate entity should be disregarded because the hospital always has been and still is a private enterprise of Dr. Glass and his brother and not a charitable institution; (3) Dr. Glass is the "founder" of the hospital and, in effect, grantor of a trust, the terms of which have been violated by the hospital's refusal to renew his privileges to practice in it; (4) Dr. Glass has a contract right to practice for life in the hospital; and (5) the hospital's refusal to renew his privileges to practice in the hospital was illegal because (a) he had no previous notice of the action and was not given the opportunity to be heard, (b) the board of trustees that took the action was not legally in office at the time, and (c) the action taken was unlawful, capricious, arbitrary, unwarranted and unjust.

We think that appellant's contention as to membership in the hospital will not stand up. The charter of Doctors Hospital, Inc., sets the original number of directors at five and provides that the number may be changed in any lawful manner that the by-laws may from time to time provide, and that the corporation is to have no stock. The management of the business and affairs of the corporation is vested in the directors who shall determine all affairs, matters or things

pertaining to its business or affairs. The by-laws provide that the board of trustees (that is, the board of directors) shall consist of nine members which may be increased or decreased, that they shall annually, in January of each year, elect their successors who shall serve for one year or until their successors are elected and take office, and that vacancies shall be filled by the remaining trustees. The chancellor held, correctly we think, that the hospital's charter and by-laws provide that the only members of the corporation are the board of trustees. At the time of the formation of the corporation, Code, 1939 Ed., Art. 23, Sec. 17 (Code, 1956 Supp., Art. 23, Sec. 130 (a) is substantially to the same effect), provided that a non-stock corporation can restrict its members to its board of directors or trustees. There is nothing in the charter or by-laws to suggest that there are to be members other than the board. Code, 1951, Art. 23, Sec. 48 (b), provides that members of succeeding boards in a non-stock corporation shall be elected by members at their annual meeting. As the chancellor said: "* * * in the defendant's by-laws the provisions for the election by the members of the Board of their own successors in itself preclude the concept that there could be members of the corporation other than the members of the Board." There is no provision in the charter or the by-laws for any meetings except those of the board, although meetings of members of non-stock corporations are authorized by the corporation article of the Code, which says also that by-laws may be altered or repealed by members of a non-stock company. The hospital's by-laws provide that they may be amended, altered or repealed by a majority vote of the board. It is our view, as it was that of the chancellor, that "* * * the members of the Board of Trustees are for all corporate purposes, the only members of the corporation." See *Brune, Maryland Corporation Law and Practice,* Rev. Ed., Sec. 99, p. 96. Dr. Glass contends that the provisions of the corporation article (Sec. 17 of Code 1939, and Sec. 130 (a) of Code, 1956 Supp.) that "* * * in any case in which any such corporation has in fact no members other than the members of its governing * * * board * * * the members for the time being of its

governing * * * board shall * * * be taken to be the members of such corporation * *⋅*", imply that a non-stock corporation in fact may have other members than its board, even though no express provision is made for such members. The chancellor held, and we agree, that this provision covers only the contingency where the charter or by-laws provide for members other than the board and thereafter, because of resignations or death, the only remaining members are the board of trustees.

We think there was abundant and almost overwhelming evidence to show that Doctors Hospital, Inc., is, and for many years has been, a charitable corporation. Dr. Glass himself, in order to secure tax exemptions or tax refunds, repeatedly stated (a number of times under oath) that the hospital was non-profit, that it never turned down a free case, that there was no difference between its operations and those of any other charitable hospital in Baltimore. Testimony of board members was to the same effect. The hospital is exempt from all City and State taxes as a recognized charitable corporation. The federal tax authorities at one time ignored the corporate entity in order to tax the Glass brothers on a net worth basis, but subsequently restored the hospital's charitable income tax exemption for the full period on which limitations had not run, and the hospital has never paid, nor been asked to pay, federal income taxes. The Ford Foundation gave it funds as a non-profit institution. The record establishes beyond question that no part of the income or profits of the hospital inures to the benefit of any individual. Salaries and compensation for services rendered are, of course, paid but this does not prevent the hospital from being a charitable institution, and neither does the fact that most patients pay their way, since the monies received continue to be applied entirely towards facilities for the care and cure of those needing medical or surgical help. 4 *Scott on Trusts,* 2d Ed., Secs. 372 and 372.1.

The record also clearly sustains the chancellor's finding that Dr. Glass had voluntarily relinquished all control of the operation and management of the hospital and had conceded that this belonged to the board of trustees in fact as well as

in legal theory. In January, 1949, Dr. Glass himself emphasized this at a medical staff meeting: "the Board of Trustees is entirely in charge of the hospital." In 1950, Dr. Glass signed an application for privileges as a member of the medical staff, in which he agreed to abide by the by-laws of the staff (which had to be approved and put in force by the trustees) and by such rules and regulations as might be from time to time enacted, and he testified that he fully understood the effect of the document and intended to be bound by it. A few days after this, Dr. Glass' accountant, with his knowledge and consent, wrote to the Bureau of Internal Revenue that "* * * the hospital * * * is under the complete control of a lay Board of Trustees, none of whom has any financial interest in the hospital." On the stand, Dr. Glass admitted that he had "* * * turned over the control of the hospital itself, as far as managerial and governing is concerned, to the lay board of trustees." Earlier, he had congratulated himself for "* * * voluntarily divesting himself of authority." Dr. Glass' resignation from the board, as well as his subsequent relinquishment of all authority to the trustees, was prompted by the fact that recognition by the Blue Cross and accreditation by the American Medical Association would not be forthcoming without it. We think the chancellor put it well when he said: "He made his choice, however, between retaining his personal control, and surrendering it for his larger objective. Having made it, he is not now in a position to ask the Court to restore the personal control the displacement of which was a condition of the hospital's success."

Much of what has been said answers Dr. Glass' contention that because he was the "founder" and in effect the grantor of a trust, the hospital had no right to violate the terms of the trust by refusing him his privilege to practice at the hospital. As far as the funds invested in the hospital by the doctor are concerned, the chancellor found that all of them, including "the amounts subscribed to the stock of Doctors Hospital of Maryland, Inc.", had been incorporated in the mortgage. If there ever was a trust that the hospital be managed, so as to provide facilities for all competent general

practitioners, including Dr. Glass, that objective has been realized. The hospital provides facilities for over one hundred general practitioners. Indeed, the substantial majority of the staff are general practitioners who have privileges in all fields for which they are qualified. Dr. Glass, having relinquished personal control and having agreed to abide by the rules and regulations of the hospital, cannot complain that in an honest exercise of discretion the governing body has barred him from future practice in the hospital.

We turn then to Dr. Glass' contention that he has a contract right to practice in the hospital for life. The hospital makes the vigorous contention that there was never any such agreement, pointing out that the contract alleged by the doctor was not mentioned in the original bill filed in the case, nor in the petition for leave to file an amended bill after the demurrer to the original bill had been sustained, as well as that the contract was substantiated only by an unsigned minute written on one side of the doctor's letterhead, on the reverse of which was the history of the blood pressure of a patient. In the alternative, the hospital urges that if it be found that such a contract was made, it was *ultra vires* and void as against public policy and further, that by his application for privileges in 1951, Dr. Glass waived his rights under the contract. We find it unnecessary to deal with any of these contentions. We do not so decide, but assume for the purpose of the case, that there was such a contract as alleged by Dr. Glass and that it is not *ultra vires* or against public policy, and that it has not been waived. Even on these assumptions Dr. Glass has no rights that were violated when the hospital dismissed him, since on March 2, 1953, he executed a formal general release, in writing for a valid consideration, in which he waived all claims of every kind that he had against the hospital, including those arising by way of contract.

The release was one of three instruments executed at the same time. The other two were a deed whereby Doctors Hospital, Inc., purchased from Dr. Glass and his wife a building in the rear of the hospital, housing the laundry, cafeteria and boiler room, and an agreement by the hospital to convey

to Dr. Glass and his wife the small portion of the hospital lot on which stood an apartment house owned by the doctor. In the release, for a consideration of $12,500, Dr. Glass and his wife "jointly and severally" released the hospital from, *inter alia,* "all * * * actions, * * * accounts, contracts, promises, * * * claims and demands whatsoever, in law or in equity, * * *. Excepting, however, any mortgage or mortgages held by Louis J. Glass and Mildred A. Glass alone or together with others." There is no doubt that the literal language of the release covers the claim now sought to be made and Dr. Glass does not argue to the contrary. Nor does he contend that he failed to read or understand the meaning of the release and he concedes that he and his wife were represented by experienced counsel when they signed it. The argument is that despite the language of the release, there was no intention to release the claim he now makes as to the contract. No proffer was made as to what he specifically expected to show by parol evidence. The court offered to hear parol evidence if there were any claim of fraud or mistake but none was charged. Specifically, Dr. Glass now claims (1) that he intended to confine the release to those transactions in which both he and his wife had an interest, and (2) that since his contract claim is not mentioned in the release, it was not intended to be covered. The express language of the release is that it was joint and several and, in addition, Dr. Glass' further suggestion that the release really settled his claim for back salary—he had previously said he was entitled to no salary—is inconsistent with the argument that the release covered only matters in which he and his wife had a joint interest.

We think the chancellor was clearly justified in refusing to hear extrinsic evidence as to what the appellant intended the release to mean or what he thought it was intended to cover. Stated broadly, the rule is that as a matter of substantive law, parol evidence is inadmissible to vary, alter or contradict a writing which is complete, unambiguous and valid, where no fraud, accident or mistake is claimed. The rule is applied in equity and a release, as a contractual instrument, is subject to its effects. The text writers, in analyzing

the rule as stated, have taken note of the many important limitations and exceptions to the rule and of the fact that the definition of it may assume what must be determined in deciding whether it is operative. See *McCormick on Evidence,* Chap. 24; 9 *Wigmore on Evidence,* 3rd Ed., Sec. 2400, *et seq.;* 3 *Williston on Contracts,* Rev. Ed., Sec. 629, *et seq.; Restatement, Contracts,* Secs. 237-244 (and Secs. 228-236 on Integration); 3 *Corbin on Contracts,* Chap. 26. In *Ray v. Eurice,* 201 Md. 115, 125, 127, we said that absent fraud or duress, "* * * if a contract has been integrated, it may not be varied by parol in the absence of mutual mistake, nor will it be rescinded or redrafted by the Court if one of the parties finds that he has made a bad deal or has become dissatisfied with its provisions. * * * Finally, where there has been an integration of an agreement, those who executed it will not be allowed to place their own interpretation on what it means or was intended to mean. The test in such case is objective and not subjective."

In *Vincent v. Palmer,* 179 Md. 365, 375, the same general principles were stated to be applicable to a release, although on the facts the generalities of the release in that case were held to be limited to what the parties actually had in mind.

In the case before us, Dr. Glass does not claim that the release was secured by fraud or mistake, that it was not intended to be effective, that it is not valid, or that it is ambiguous. Where, as is the case here, the writing is complete on its face, extrinsic evidence to prove a distinct and separate agreement on a matter as to which the writing is silent, may be admitted only if the parties did not intend the writing to cover all of the matters embraced in their prior or contemporaneous negotiations and, in determining this intention, the court should consider the closeness or similarity of the alleged parol agreement to the writing, the surrounding circumstances and what persons ordinarily might be expected to do under the circumstances as to the inclusion of the particular matters in the writing. 70 A. L., R. 752, 770-771, "Parol-evidence rule: tests for determining whether entire agreement is embodied in the writing (rule of integration)";

*Markoff v. Kreiner,* 180 Md. 150, 155-157. When the chancellor put himself in the position of the parties, he found that active disputes had raged between Mr. Sokol and the board, on the one hand, and Dr. Glass on the other, during all of 1952 and the early part of 1953. In December, 1952, Mr. Sokol consumed several hours in outlining to the board the complaints that the hospital authorities had against Dr. Glass' behavior. Mrs. Glass had been dismissed from the hospital's housekeeping staff. Dr. Glass had been accused of misappropriating or misusing hospital property. He had been reprimanded for derogatory remarks made about the hospital in public. He had been accused of bringing into the hospital an alcoholic patient. He pictured himself as the "only remaining obstacle" to the full control of the hospital by the trustees. He complained that his patients were so closely supervised that he found it intolerable. The minutes of the board of trustees of the meeting held February 19, 1952, set forth the report of a chairman of a committee appointed to deal with Dr. Glass concerning the purchase of the building in the rear of the hospital, that "Dr. Glass was reluctant to sell the rear of the building, fearing that he might then be dismissed from the hospital staff." Dr. Glass never denied the accuracy of this conclusion. Specific property matters in dispute between the hospital and Dr. Glass were settled, and the settlement evidenced by the deed and agreement referred to above. In view of the dismissal of Mrs. Glass from the housekeeping staff, the constant bickering and disagreement between Dr. Glass and hospital authorities, and his expressed fear that he might be dismissed, it is scarcely conceivable that an exception to the generality of the release would not have been specifically incorporated, as was the mortgage claim of the Glasses, if any such exception had been intended by both sides, or that the release would have been silent on the point if the matter had been thought not to have been covered.

Dr. Glass relies heavily on the case of *Arthur v. Morrow Bros.,* 131 Md. 59. There a release containing the usual words of a general release was executed by several sub-contractors in favor of the principal contractor in consideration

of payment of the agreed balance due for work at the State Normal School. One of the sub-contractors was due monies for work on an entirely different contract for some tunnels under a building. When an effort was made by attaching creditors to collect from Morrow Brothers the money due on the tunnel work, the release was pleaded in defense. Parol evidence of the scope of the release was considered. The Court pointed out that an agreement had been executed on the same day as the release in which was recited the contract for the work at the State Normal School, and that a dispute had arisen as to the amount due by the principal contractor and that the parties had agreed that the total amount due was $11,500. · The release itself recited that there had been differences and disputes between the parties regarding certain work to be done "at and on the Maryland State Normal School" and that the differences and disputes had been adjusted to the satisfaction of the parties thereto and that, in consideration of $10,500 in hand paid and $1,000 more to be paid when final payment was made to the principal contractor, the sub-contractors released the principal contractor. The Court found evidence in the words of the release itself, considered in the environment in which it was executed, that it dealt only with the Normal School contract. Substantiation was seen in the fact that one of the sub-contractors was interested only in the Normal School contract and not in the tunneling contract, and the Court found it unreasonable to assume that an instrument dealing with a matter in which several sub-contractors were jointly interested was meant to apply to another matter in which only one of them was interested. The parol evidence that only the Normal School contract was intended to be covered by the release came in entirely without objection and there was no contradiction of it on the part of the general contractor, who offered no testimony on the point. Over and above all of this, the Court held that if the release had included the tunnel monies, it would have been legally fraudulent and, so, null and void and of no effect against the attaching creditors of the sub-contractor to whom the money was due, as a voluntary conveyance of a grantor without means to pay his debts. What

we have said of the *Morrow* case makes it apparent that it is entirely distinguishable from the case at bar.

We have found no authority that would justify the introduction of extrinsic evidence to show that the right claimed by Dr. Glass was not covered by the words of the release. See 3 *Corbin on Contracts,* referred to above, where the author in Sec. 574, note 16, cites cases in support of the proposition that: "In like manner, a general release of all claims operates exactly as it reads, so long as it is not avoided for fraud or mistake. An antecedent claim cannot be enforced by making proof that it was not included within the terms of the release. The words have no ambiguity, are later in time than the understanding now offered in evidence, and are in direct contradiction of that evidence." 6 *Williston on Contracts,* Rev. Ed., Sec. 1825, p. 5169, note 4; 32 *C. J. S., Evidence,* Sec. 927. For cases holding that a general release may not be impeached by extrinsic evidence, see *Tupper v. Hancock* (Mass.), 64 N. E. 2d 441, 443; *Crow v. Bowers* (Ga.), 51 S. E. 2d 855; *Schar v. Maier* (Pa.), 49 A. 2d 387; *Miller v. Gane* (Mass.), 192 N. E. 313; *Radovsky v. Wexler* (Mass.), 173 N. E. 409.

Dr. Glass' contention that his dismissal was invalid because it was without notice to him and he had no opportunity to be heard, is based on the contention that he was dismissed for cause, and that in such case the by-laws of the medical staff required notice and hearing. We think this misconceives what occurred. Dr. Glass challenges the validity of the pertinent by-laws of the medical staff adopted by the board in November, 1954, but both before and after November, 1954, the by-laws of the medical staff provided that appointments should be for the calendar year in which the appointment is made. Dr. Glass was not dismissed during the year. He was merely notified that his year-to-year privileges would not be renewed when they expired. In such case no notice, other than that given him, and no hearing are required. In *Levin v. Sinai Hospital of Balto.,* 186 Md. 174, this Court held that a private hospital has the right to exclude any physician from practicing in it and that such exclusion rests with the managing authorities, adding that the

directors of a private hospital corporation who have the power to appoint members have the power to remove them from the staff. The Court concluded: "It is clear, therefore, that since the by-laws of defendant provide that appointments to all divisions of the medical staff shall be made for only one year, appellant has no right to object to his removal from one of the divisions of the staff." We think the procedure followed by the board, in allowing Dr. Glass' privileges to expire at the end of the year without renewal, was fully in accord with the by-laws of the medical staff and the principles of the *Levin* case.

The contention that the board of trustees which had dismissed Dr. Glass was not legally in office requires no extensive discussion. If it be assumed that Dr. Glass has the right to challenge the legality of the board, which may be doubted, 2 *Fletcher, Cyclopedia Corporations,* Perm. Ed., Sec. 293, and 13 *Am. Jur., Corporations,* Sec. 484, there is no substantial basis for the points he makes. These are that insufficient notice was given of the meeting at which the number of trustees was reduced to ten and the ten trustees were elected for 1954, and that the election was held in December, 1953, rather than in January, 1954, as provided by the by-laws. Three former members of the board allege lack of notice. However, the minutes and the testimony show that general meetings of the board, at which all matters presenting themselves were dealt with, were held monthly and that all of the members of the board were notified of the dates for the three general meetings held in October, November and December, 1953. At the October meeting, the president announced the appointment of a nominating committee to recommend a change in the size of the board and to submit nominations for the trustees and officers for the year 1954. This committee reported at the November meeting, of which all three of the complaining trustees had notice and at which two were present, recommending that the board be reduced to ten. It was made clear at this meeting that the committee would bring in a slate of nominations at the meeting in December. This was done in fact and a vote was taken on the nominations of the committee and on the

nominations submitted from the floor. As a result, the ten proposed were elected. At the December meeting, two of the complaining trustees were present and the other was present at the October and November meetings and had notice of the December meeting.

The contention that the election was invalid because held at the December meeting is without merit. The board had always been informal about observing the letter of the by-laws in connection with elections and had often elected trustees without regard to the January date. In fact, the board had never held an election of trustees in January. This continuous course of conduct and acquiescence in it by those complaining would seem to leave them without standing on this point. *Poole v. Miller,* 211 Md. 448. See also 2 *Fletcher,* work cited, Sec. 293; and Code, 1951, Art. 23, Sec. 34 (b).

Finally, we agree with the chancellor's finding that there was no basis for the charge that refusal to renew Dr. Glass' privileges to practice at the hospital was arbitrary, capricious, unwarranted or unjust. The record is replete with evidence that Dr. Glass was an obstacle to the control of the hospital by the board, that he was not amenable to discipline, which he often required, and that his presence led to an inharmonious working of the hospital. It is clear that he was either unable, or refused, to comport himself effectively and agreeably within the framework of a charitable hospital conducted on a high plane by a public spirited and sincere board of trustees, as such hospitals generally are conducted, and that this attitude created the situation which justified the exercise of an honest discretion by the board leading to his elimination from the scene.

It is regrettable that the appellant can no longer participate in the activities of the institution which he founded and started on the road to the success and usefulness it has now achieved, but we are forced to the conclusion reached by the chancellor that he himself is responsible for the fact that he has no redress from the action which deprived him of this opportunity.

*Decree affirmed, with costs.*