SIEGEL, APPELLANT, *v.* ST. VINCENT CHARITY HOSPITAL & HEALTH CENTER, APPELLEE. ■

144

(No. 51603 — Decided April 6, 1987.)

*Marvin L. Karp,* for appellant.
*Patricia Hemann* and *James D. Knotter, Jr.,* for appellee.

PATTON, J.   Howard S. Siegel, M.D., appeals the judgment of the Cuyahoga County Court of Common Pleas affirming the decision of the Board of Trustees of St. Vincent Charity Hospital and Health Center which denied Siegel's application for reappointment to Charity's Medical Staff. The facts giving rise to this appeal are as follows.

On December 20, 1983, the board of trustees (hereinafter "board") of St. Vincent Charity Hospital and Health Center (hereinafter "Charity Hospital"), by unanimous vote, denied the application of appellant, Howard S. Siegel, M.D., for reappointment to Charity Hospital's Medical Staff. The basis for the board's action was its conclusion that Dr. Siegel failed to meet the standards of ethics, conduct and cooperation with Charity Hospital personnel required by the Medical Staff Bylaws (hereinafter "Bylaws"). The board's action on Dr. Siegel's application was the final step in the review process to which such applications are submitted.[1]

Dr. Siegel requested an internal review of the board's decision. On February 9, 1984 and February 27, 1984, a Hearing Committee heard testimony presented on behalf of Charity Hospital and Dr. Siegel. On March 6, 1984, the Hearing Committee issued a report concluding that Dr. Siegel had "engaged in a continuing pattern of negative and disruptive behavior — conduct — in violation of the Preamble to, and the Medical Staff Bylaws of [Charity Hospital] and, therefore, unanimously recommending affirmance of the board's denial of Dr. Siegel's application for reappointment." The Hearing Committee went on to recommend that Dr. Siegel be considered for "Associate Active Medical Staff" status and that he stipulate in writing that he would adopt a constructive attitude and refrain from public criticism of the hospital and its personnel. In April 1984, a proposed agreement was presented to Dr. Siegel in which both these recommendations were implemented. Dr. Siegel was also required to drop all further appeals and release Charity Hospital and each of its trustees and officers from any claims or causes of action. Dr. Siegel rejected this proposal.

Dr. Siegel requested an internal appellate review of the Hearing Committee's recommendation. Such review was conducted on May 21, 1984 and, on May 30, 1984, the Appellate Review Committee unanimously recommended

---

[1] The following actions preceded the board's decision:

*October 1983*—Dr. Siegel submitted his application for reappointment. This application is made on an annual basis.

*November 29, 1983*—The Credentials Committee (comprised of members of Charity Hospital's Medical Staff) recommended Dr. Siegel's reappointment.

*December 12, 1983*—The Medical Executive Committee (comprised of members of Charity Hospital's Medical Staff) recommended Dr. Siegel's reappointment.

*December 19, 1983*—The Medical Affairs Committee of the board recommended denial of Dr. Siegel's reappointment.

affirmance of the board's action. This committee found that the decision of the board was supported by substantial evidence, was justified, and was not arbitrary or capricious.

Pursuant to the Bylaws, the matter was submitted to another hospital committee, the Joint Conference Committee. The Joint Conference Committee, comprised of members of the Medical Staff and of the board, reviewed the board's action on July 12, 1984. That committee voted sixteen to three to recommend affirmance of the board's decision on the basis that the board's decision was justified and not arbitrary or capricious.

By resolution dated August 21, 1984, the board, "having again reviewed the record of Dr. Siegel's sustained disruptive conduct, failure to cooperate with Hospital personnel and public disparagement of the Hospital," reaffirmed its denial of Dr. Siegel's application for reappointment to the Charity Hospital Medical Staff.

Dr. Siegel subsequently filed suit in the Cuyahoga County Court of Common Pleas on August 22, 1984. In Count One of his complaint, Dr. Siegel alleged that Charity Hospital wrongfully denied his reappointment application to its Medical Staff. In Count Two, he sought damages from David D'Eramo, President and Chief Executive Officer of Charity Hospital, and Sam A. Cottone, former chairman of the board, on the ground that they had conspired to injure Dr. Siegel by depriving him of his Medical Staff privileges.

The parties agreed to bifurcate Counts One and Two for trial. The court, pursuant to a motion made by Charity Hospital to limit the scope of proceedings on Count One, ruled that its review would be limited to a determination of whether the criteria for reappointment delineated in the Bylaws of Charity Hospital are reasonable and nondiscriminatory and whether there was substantial evidence supporting the board's action in denying Dr. Siegel's application.

On October 31, 1985, the court entered judgment in favor of Charity Hospital. The court affirmed the decision of the board, concluding that such decision was reasonable and nondiscriminatory and was supported by substantial evidence.

On January 28, 1986, the court, pursuant to Dr. Siegel's request, entered a voluntary dismissal without prejudice of Count Two. A timely appeal of Count One followed.

At the hearing before the Hearing Committee in February 1984, both Dr. Siegel and Charity Hospital were represented by counsel. During the course of the hearing, Charity Hospital called five witnesses; Dr. Siegel testified in his own behalf and called two witnesses. The following evidence was adduced at the hearing.

For more than twenty years prior to December 1983, Dr. Siegel had been a member of the Medical Staff of Charity Hospital. In addition, he had served as President of the Medical Staff and had, for more than fifteen years prior to February 1983, served as Director of Charity Hospital's Division of Ophthalmology (hereinafter the "Eye Department").

Dr. Siegel's theory of the board's action in denying his application is that it "emanated directly from an entrepreneurial dispute on East 22nd Street." (Appellant's brief at 4.) Since 1967, Dr. Siegel has been the President of, and a shareholder in, 2475 E. 22nd, Inc., a corporation which owned and operated the Central Medical Arts Building, located across the street from Charity Hospital. The Central Medical Arts Building leased office space to commercial tenants, as well as members of Charity Hospital's Medical Staff.

In the spring of 1981, 2475 E. 22nd, Inc. began negotiating with the city of Cleveland about the corporation's interest in developing a portion of land on East 22 Street known as the South Municipal Parking Lot, which was owned by the city of Cleveland. 2475 E. 22nd, Inc. (hereafter "2475") proposed a ten- to twelve-story building for use by non-physicians and mentioned in its proposal the need to coordinate its plans with Charity Hospital's need for parking. According to Dr. Siegel, in March 1982, 2475 essentially had "the green light" from the city of Cleveland to proceed with the project. Previous to this date, Dr. Siegel had no knowledge of any expansion plan by Charity Hospital for the same area. Dr. Siegel testified that he became aware of Charity Hospital's plans to acquire both the South and North Municipal Parking Lots around May 11, 1982. On that date, Sam A. Cottone, then Chairman of the Board, sent a letter to all the tenants and shareholders of 2475 informing them of Charity Hospital's plans for expansion which would include additional physicians' offices. The purpose of the letter also was to make the tenants and shareholders aware of 2475's competitive proposal, which represented a conflict of interest with Charity Hospital.

On January 17, 1983, Dr. Siegel attended a public hearing on Charity Hospital's request for an Urban Development Action Grant. Dr. Siegel identified himself as being the President of 2475, the Director of the Eye Department, and the Director of the Lions Eye Clinic.[2] He made various statements at the hearing, indicating that the Hospital's expansion plan was the "laughing stock" of other community hospitals, and that the plan was "a ruse" to acquire the land.

On January 31, 1983, George Forbes (city of Cleveland Council President) stated that Charity Hospital would be granted the opportunity to go forward with its expansion plan. The project was to proceed in four phases, and Forbes stated that the subject land would be transferred phase by phase and not be transferred until ground was broken.

During January and February 1983, Dr. Siegel's reappointment as Director of the Eye Department was under scrutiny. On January 3, 1983, the Medical Executive Committee recommended that Dr. Siegel be reappointed as director. Its recommendation then went to the Medical Affairs Committee, comprised of members of the board, which directed the Medical Executive Committee to reconsider its recommendation. Dr. Siegel was ultimately not reappointed as head of the Eye Department in February 1983.

Other events occurred in 1983 prior to Dr. Siegel's application for reappointment to Charity Hospital's Medical Staff for 1983. This included a letter sent to the editor of the Plain Dealer by Dr. Siegel and printed on June 13, 1983. Dr. Siegel testified that the letter was written to describe his perception of what was occurring in the medical community. The letter contains specific references to Charity Hospital including its expansion plans. At the hearing, by way of cross-examination, counsel for Charity Hospital challenged the validity and the basis of Dr. Siegel's statements.

On June 15, 1983, a resolution was passed by the board requesting the Medical Executive Committee to initiate corrective action against Dr.

---

[2] The Lions Eye Clinic, which is funded by the Lions Club and housed at Charity Hospital, provides free eye care to financially needy individuals.

Siegel as provided for in the Bylaws. Pursuant to this request, a meeting was held on August 8, 1983 before the Medical Executive Committee. Dr. Siegel made a statement at the meeting and left immediately afterward, thereby providing no opportunity for questions. This statement made by Dr. Siegel at the meeting was considered by Charity Hospital in its Statement of Charges against Dr. Siegel as evidence of his disruptive conduct.

A letter of admonition was sent to Dr. Siegel by the Medical Executive Committee. The letter *inter alia* urged Dr. Siegel not to make allegations against Charity Hospital. There was testimony that Dr. Siegel did not make any such statements after receiving the letter.

In October 1983, Dr. Siegel submitted his application for reappointment. The Credentials Committee and Medical Executive Committee recommended approval of Dr. Siegel's application. Dr. Paul Johenning, then President of the Medical Staff and Chairman of the Medical Executive Committee, testified that when his committee decided to recommend reappointment, they also decided to communicate their concerns to Dr. Siegel:

"[W]e felt rather strongly that we didn't approve of his behavior and that his behavior was harmful to the hospital and to the staff. And after some discussion, we felt that we would write him a letter outlining his activities for the year and indicating to him that we didn't approve and that if he couldn't change his behavior, we would appreciate his resignation."

Two letters were sent to Dr. Siegel on December 22, 1983 from different members of the Medical Executive Committee expressing their respective concerns.

Dr. Siegel's application then went before the Medical Affairs Committee. Sam A. Cottone testified about this committee's concerns with Dr. Siegel:

"There was a discussion of all of the factors that are enumerated, I believe, as part of the credentialing process, all the factors are to be considered for appointment privileges or granting of privileges.

"That included medical and nonmedical. On the medical side, that was a very short discussion. It was agreed that no one had any serious objections as to medical competence, and actually comments to the contrary had been made in previous discussions.

"So the entire focus after the brief discussion was on nonmedical matters like cooperation, adding to the image and reputation of the hospital or not doing that. So much of the discussion was on his activities both public and private, private within the hospital, as far as disrupting the activities of the board.

"It was kind of a rehashing of * * * discussions that had been held as long as I have been here about the fact that his activities are not helping the hospital, but have been providing nothing but disruption, and quite a few people mentioning the fact that they were sick and tired of wasting the time and dealing once again with problems caused by Dr. Siegel."

The Medical Affairs Committee unanimously recommended denial of the application for reappointment. On December 20, 1983, the board voted to deny Dr. Siegel's application for reappointment.

Sister Mary Patricia Barrett, then President of the Sisters of Charity of St. Augustine Health and Human Services and a member of the board, testified:

"* * * [I]n the reappointment process one of the stipulations or one of the criteria for reappointment is that a physician does agree to work coopera-

tively and with [Dr. Siegel's] attitude I could not see how he was going to change. * * *"

In accordance with procedures set forth in the Bylaws, Dr. Siegel was notified of the board's action and of his right to a review of the decision. Upon his request for a review by an internal hearing committee, the board submitted to him a Statement of Charges setting forth the specific acts which served as the basis for the board's decision. At the hearing before the Hearing Committee, the previous evidence was introduced, as well as other evidence establishing various items outlined in the Statement of Charges. On March 6, 1984, the Hearing Committee issued its report, making findings of fact.[3]

Dr. Siegel contested the conclusion of the Hearing Committee and further internal appellate review was undertaken. The ultimate result of this appellate review process that eventually occurred was the denial of Dr. Siegel's application for reappointment to Charity Hospital's Medical Staff.

Dr. Siegel assigns four errors for our review:

"I. The common pleas court erred in holding that defendant's Medical Staff Bylaws permit denial of reappointment to the Medical Staff on grounds other than lack of professional skill and competence, or conduct adversely affecting patient care.

"II. The common pleas court erred in holding that a hospital may validly refuse to reappoint a physician to its medical staff because of a dispute with hospital trustees or with officials not directly involved with patient care.

"III. The common pleas court erred in holding that the Board of Trustees did not act arbitrarily,

capriciously, unreasonably or subjectively in rejecting Dr. Siegel's application.

"IV. The common pleas court erred in refusing to permit discovery of evidence relating to plaintiff's claim that defendant's action was arbitrary and capricious."

I

Charity Hospital's Bylaws delineate the criteria which the board must consider in reviewing applications for reappointment to its Medical Staff. In his first assignment of error, appellant contends that the trial court used criteria other than professional skill, education and competence or conduct adversely affecting patient care when it affirmed the board's denial of Dr. Siegel's application. Dr. Siegel argues that the court's conclusion in this regard is inconsistent with the language of Charity Hospital's own Bylaws.

Dr. Siegel cites to two provisions of the Bylaws to support his contention: Section 3(2), Article V and Section 5(10), Article VIII. Section 3(2), Article V states:

"Reappointment to Medical Staff shall be performed on an annual basis. Each recommendation concerning the reappointment of a Medical Staff member shall be based on an appraisal of each member's professional and clinical judgment in the treatment of patients, *ethics and conduct*, compliance with the Hospital's Code of Regulations and the Medical Staff Bylaws, Rules and Regulations, *cooperation with hospital personnel*, use of the hospital's facilities for his patients, service on Medical Staff and Hospital committees, timely completion of medical record[s], attendance at Medical Staff and Clinical Department meetings, health status, and recommendations of any department or service to which the member has been assigned. * * *" (Emphasis added.)

---

[3] These findings of fact are set forth in the Appendix.

This provision is unambiguous. We agree with the lower court when it stated:

"It is clear from the above-cited section that the Board of Trustees of Charity Hospital is authorized by the Medical Staff Bylaws to consider, *inter alia,* a physician's ethics and conduct, as well as his cooperation with hospital personnel when evaluating an application for reappointment as a member of the Medical Staff." Opinion and Partial Judgment Entry as to Count One of the Complaint at 5 (hereafter "Partial Judgment Entry").

Appellant is contesting the fact that the court considered, as "other criteria," cooperation with hospital personnel who were not directly involved in patient care to deny Dr. Siegel's application. The Preamble to the Bylaws recognizes the need for a cooperative effort among the board, the administration and the Medical Staff of Charity Hospital in order for Charity Hospital to meet its objectives of providing quality medical care:

"Recognizing that the Medical Staff is responsible for the *quality of medical care* provided in the hospital, subject to the ultimate authority of the Board of Trustees, and *recognizing that the best interests of the patient are protected by a cooperative effort of the Board of Trustees, Administration and Medical Staff,* the Physicians and Dentists practicing at Saint Vincent Charity Hospital and Health Center hereby organize themselves in conformity with the Bylaws, Rules and Regulations as hereinafter provided." (Emphasis added.)

The import of the Preamble thus indicates that the patient is best served when Charity Hospital's administration, board and Medical Staff collaborate in their efforts to ensure the quality of medical care.

Dr. Siegel further argues that the hospital cannot deny him reappointment based on oral or written utterances he made regarding a private, entrepreneurial dispute when there is no question as to his professional competence or conduct in matters dealing with patient care. Such action is impermissible according to his interpretation of Section 3(2), Article V in conjunction with Section 5(10), Article VIII of the Bylaws. Dr. Siegel argues that if Section 3(2), Article V permits denial of reappointment for reasons other than professional competence, skill or education, it is inconsistent with Section 5(10), Article VIII which states that all "hearings provided for in these Bylaws are for the purpose of resolving matters bearing on professional competence and conduct."

Dr. Siegel claims that for the Article provisions to be consistent, one must modify the word "conduct" in Section 3(2), Article V by the word "professional," as the word "conduct" is modified by the word "professional" in Section 5(10), Article VIII. This court disagrees with such a construction as did the lower court. Section 5(10), Article VIII does not state professional conduct, nor can the construction which Dr. Siegel advocates be placed upon Section 3(2), Article V. Even if such a construction were to occur so that the board could only review Dr. Siegel's professional conduct, the record does not indicate that the board went beyond this limitation when it made its decision.

As the court below found, the inquiry by the board into Dr. Siegel's conduct was not necessarily an inquiry into his personal conduct as opposed to his professional conduct. "The Court is unconvinced that [Dr. Siegel] could so easily make the transition from professional to entrepreneur, especially when he obtained access to the public forums utilized for criticism of defendant Charity Hospital principally because of his professional status." Partial Judg-

ment Entry at 15. Likewise, this court is unable to dichotomize Dr. Siegel's medical and professional conduct from his personal business conduct.

The record reveals instances where it is difficult to distinguish between Dr. Siegel's "professional conduct" and his "personal conduct." Dr. Siegel claims that when he made the statements at issue he was operating in his entrepreneurial or personal capacity. The record reveals, for example, that when he testified at an Urban Development Action Grant hearing on January 17, 1983 regarding Charity Hospital's proposed land acquisition on East 22 Street, he identified himself as president of the corporation which owned the Central Medical Arts Building and Director of Charity Hospital's Ophthalmology Department and Lions Eye Clinic, as well as a past Chief of Charity Hospital's Medical Staff, and thus intermingled his various roles.

Accordingly, the Bylaws at issue do permit the board to review an application for reappointment on grounds other than professional competency or skill.

Dr. Siegel's first assignment of error is not well-taken.

II

Dr. Siegel premises this second assignment of error on the fact that, if the Charity Hospital's Bylaws permit denial of reappointment to the Medical Staff based upon the physician's ethics, conduct and cooperation with hospital personnel, then the Bylaws violate R.C. 3701.351 as interpreted by the Ohio Supreme Court in *Dooley* v. *Barberton Citizens Hospital* (1984), 11 Ohio St. 3d 216, 11 OBR 532, 465 N.E. 2d 58. According to appellant, "the rule of law established by *Dooley* is that standards prescribed by a hospital for membership in its medical staff which do not reasonably relate to 'ac-

cepted measure of skill, education and competence' are not 'objective' and therefore invalid" (appellant's brief at 25) and, applying this rule to Charity Hospital's Bylaws, such Bylaws are invalid. Dr. Siegel further asserts that a physician may not be denied reappointment to a medical staff unless his conduct has a demonstrable effect on patient care.

The first issue to be addressed under this assignment is the scope of judicial review of hospital bylaws. Charity Hospital argues that the court should follow the Ohio Supreme Court's holding in *Khan* v. *Suburban Community Hospital* (1976), 45 Ohio St. 2d 39, 74 O.O. 2d 56, 340 N.E. 2d 398, which states that a hospital's standards for physician privileges should be reasonably related to the operation of the hospital and fairly administered. According to *Khan,* absent a showing that a board of trustees has acted in an unreasonable or discriminatory manner, the actions of the board of a non-profit hospital will not be overturned as the court should not substitute its judgment for that of the board.

Dr. Siegel, on the other hand, claims that the court should review the board's decision under the standard impliedly enunciated in the syllabus of *Dooley, supra, i.e.,* that the criteria used by a hospital for staff membership or clinical privileges must be "reasonably related to accepted measures of skill, education and competence." Dr. Siegel argues that the holding of *Khan, supra,* was modified by the enactment of R.C. 3701.351 as stated in *Dooley, supra.*

A review of *Dooley, supra,* indicates that its holding is not on point and therefore not applicable to the case *sub judice.* In *Dooley, supra,* the Ohio Supreme Court considered whether the original bylaws of Barberton Citizens Hospital discriminated against the appellant because of his

practice as a podiatrist. The court acknowledged that prior to the enactment of R.C. 3701.351 "the rulings of the courts of this state left little doubt that hospitals were to be given substantial discretion in the promulgation of rules relating to staff privileges." 11 Ohio St. 3d at 219, 11 OBR at 534-535, 465 N.E. 2d at 62. The court interpreted the enactment of R.C. 3701.351(B) to modify earlier Ohio law governing hospital discretion with respect to staff privileges. The court stated:

"* * * Because R.C. 3701.351(B) is designed to remedially prevent discrimination against podiatry, we are compelled to construe the statute in a manner to reach the presumably intended just and reasonable result (R.C. 1.47) and to effectuate the legislative intent. Thus, while R.C. 3701.351 specifically recognizes the continued need for hospitals to exercise discretion in the selection of staff, we can no longer rely on such discretion where *class-wide* discrimination is extant as delineated in R.C. 3701.351(B). The test we must use is whether the rules and/or regulations of a hospital either overtly or implicitly discriminate against a specified classification (in this case the profession of podiatry). * * * [Emphasis *sic.*]

"Courts, in general, have neither the ability nor the particular desire to ascertain who is a qualified person under R.C. 3701.351(B). Moreover, given the language of R.C. 3701.351 (A) which vests the hospitals with substantial discretion, it is *still* the hospital's duty and responsibility to set reasonable standards for their staffs. The health and safety of the public and the potential legal accountability of the hospital require that no other construction of the statutory language be taken. * * *" (Emphasis *sic.*) *Dooley, supra,* at 219-220, 11 OBR at 535, 465 N.E. 2d at 62.

From our review of *Dooley, supra,* and its facts and rationale,[4] absent the class-wide discrimination[5] as the court was concerned with in *Dooley, supra,* we conclude that the board of trustees of a hospital still has substantial discretion in adopting bylaws and standards applicable to all applicants for medical staff privileges, provided such criteria are reasonable and nondiscriminatory as outlined in *Khan, supra.*[6]

The court below relied on the

---

[4] Dr. Siegel argues that the syllabus of *Dooley, supra,* controls this case. As stated in *Williamson Heater Co.* v. *Radich* (1934), 128 Ohio St. 124, 126, 190 N.E. 403, 404, the syllabus "must be interpreted with reference to the facts upon which it is predicated and the questions presented to and considered by the Court. It cannot be construed as being any broader than those facts warrant." See, also, Rule 1(B) of the Supreme Court Rules for the Reporting of Opinions.

[5] In *Fort Hamilton-Hughes Memorial Hosp. Center* v. *Southard* (1984), 12 Ohio St. 3d 263, 265, 12 OBR 342, 343-344, 466 N.E. 2d 903, 906, the Ohio Supreme Court noted that R.C. 3701.351 "is intended to remedially prevent discrimination against" medical physicians, osteopathic physicians, podiatrists, and dentists, and cited to *Dooley, supra.*

[6] In *Fort Hamilton-Hughes Memorial Hosp. Center, supra,* the Ohio Supreme Court found it unnecessary in reaching its conclusion to address the proper scope of judicial review of hospital bylaws but did cite to *Khan, supra,* and *Davidson* v. *Youngstown Hosp. Assn.* (1969), 19 Ohio App. 2d 246, 48 O.O. 2d 371, 250 N.E. 2d 892, and compared *Dooley, supra.* 12 Ohio St. 3d at 266, 12 OBR at 344, 466 N.E. 2d at 906, fn. 2. In *Samuelson* v. *St. John Medical Ctr., Inc.* (Apr. 15, 1985), Jefferson App. No. 84-J-3, unreported, the court followed the holding of *Khan* and also reviewed *Davidson* v. *Youngstown Hosp. Assn., supra,* when discussing judicial review of a hospital's board of trustees' con-

ethics, conduct and cooperation with hospital personnel provisions of the Bylaws to affirm the board's action. The next issue becomes whether these criteria are reasonable, fair and not arbitrary. Because we have already determined that *Dooley, supra,* is not applicable, we do not follow its interpretation of "reasonable" and follow instead the criteria stated in *Khan, supra,* to determine whether these Bylaws are reasonable, *i.e.,* whether the standards used by a board in reviewing medical staff privileges are reasonably related to the operation of the hospital.

The courts in Ohio have not addressed the issue of whether consideration by a hospital's board of trustees of an applicant's ethics, conduct and cooperation with hospital personnel is rationally related to the operation of a hospital. Other jurisdictions which have considered criteria similar to the Charity Hospital Bylaws provisions at issue have found such standards to be reasonably related to the delivery of quality medical care or, at least, not arbitrary, capricious or unreasonable, and to be sufficient grounds to deny a physician certain privileges, such as reappointment. See, *e.g., Ladenheim* v. *Union Cty. Hosp. District* (1979), 76 Ill. App. 3d 90, 394 N.E. 2d 770; *Sosa* v. *Bd. of Managers of Val Verde Memorial Hosp.* (C.A. 5, 1971), 437 F. 2d 173; *Bricker* v. *Sceva Speare Memorial Hosp.* (1971), 111 N.H. 276, 281 A. 2d 589; *Glass* v. *Doctors Hosp., Inc.* (1957), 213 Md. 44, 131

A. 2d 254. Although these cases are not directly on point, we find their rationale and holdings persuasive.[7]

In the instant case, the board rejected Dr. Siegel's application for reasons other than professional incompetence: non-cooperative and disruptive behavior; public disparagement of the hospital; and other incidents related to a business interest of Dr. Siegel which were in conflict with the hospital's plans for expansion. It is not disputed that Dr. Siegel was professionally competent. A review of the record, in particular the testimony before the Hearing Committee, indicates that there was friction between the board and other hospital personnel and Dr. Siegel that was pervasive and not limited to Dr. Siegel's entrepreneurial concerns. Dr. Siegel made repeated threats of litigation. Dr. Siegel also made various comments about the deterioration and dismantling of the Lions Eye Clinic if his requests were not met. This evidence and other testimony reveal the impact that Dr. Siegel's conduct had on the operation of Charity Hospital and on his professional peers.

Dr. Siegel would have this court construe the subject Bylaws to require proof of failure to cooperate with hospital personnel directly involved with patient care as the standard to deny an application for reappointment. This construction would contravene the Preamble to the Bylaws, which states the necessity of cooperation between the Medical Staff, the ad-

---

duct. The court in *Samuelson,* although reaching its decision after the enactment of R.C. 3701.351 and the pronouncement of the decision in *Dooley, supra,* discussed neither.

[7] Appellant has contended that there are no cases "which have permitted a hospital to deny (or terminate) a physician's staff privileges because of a dispute between the

physician and a hospital's Board of Trustees * * *." (Appellant's reply brief at 7-8.) In addition, he maintains that the cases cited by appellee relate to a physician's lack of cooperation with hospital personnel directly involved with patient care, *i.e.,* nurses or other doctors. According to appellant, the only "hospital personnel" that he was not cooperating with were certain members of the board of trustees.

ministration and the board to protect the best interests of the patient. We agree with the trial court's reasoning and following statement: "Mindful of the Preamble language and of the *Khan* standard [reasonably related to the operation of the hospital], the only reasonable construction of the criterion of 'cooperation with hospital personnel' is one that does not limit its consideration to cooperate with personnel directly involved with patient care." Partial Judgment Entry at 16.

Contrary to appellant's assertion, his "lack of cooperation with hospital personnel" was not limited to hospital personnel consisting of the board of trustees. See, *e.g.*, Statement of August 8, 1983 before the Medical Executive Committee (consisting of members of the Medical Staff); letter of March 24, 1981 to Gloria King, former director of the Ambulatory Care Center, threatening to dismantle the Lions Eye Clinic, as it was known then, if desired policy changes were not made; and testimony of Dr. William Steffee, M.D.

Accordingly, the Bylaws provisions used by the board in reviewing Dr. Siegel's reappointment application are reasonable. The Bylaws provisions at issue for admission to hospital privileges at Charity Hospital are nondiscriminatory. A review of the subject Bylaws, in particular Section 3(2), Article V, indicates that they are nondiscriminatory on their face. These Bylaws contain no references to impermissible considerations of sex, race, creed, color or national origin, in conformity with Section 1(2), Article III of the Bylaws:

"Medical Staff membership or particular clinical privileges shall not be denied on the basis of sex, race, creed, color, or national origin."

In addition, the instant case does not involve class-wide discrimination as was addressed in *Dooley, supra.*

As the foregoing discussion illustrates, appellant's second assignment of error is not well-taken.

## III

In his third assignment of error, appellant maintains that the board applied the provisions of the Bylaws either arbitrarily, capriciously, unreasonably or subjectively in rejecting his application. Dr. Siegel states that, if a bylaws provision is in conformity with state law, the Ohio courts are unanimous in holding that such a provision's application by a board is limited. The conduct of a board of trustees may not be unreasonable, arbitrary, capricious or discriminatory regarding the appointment or removal of a physician from its staff. See *Davidson* v. *Youngstown Hosp. Assn., supra,* 19 Ohio App. 2d at 251, 48 O.O. 2d at 374, 250 N.E. 2d at 896.

As we have agreed to follow the holding of *Khan, supra,* the extent of judicial review this court may undertake is limited to a determination of whether the Bylaws have been applied unreasonably, arbitrarily, or in a discriminatory manner. See *Kelkar* v. *Community Hosp. of Bedford* (Feb. 11, 1982), Cuyahoga App. No. 43641, unreported, at 20.

## A

Dr. Siegel first contends that the board's processing of his application was arbitrary and capricious as evidenced by its "admitted objective" to exclude him from serving on the Medical Executive Committee. However, the record does not support this argument.

It is not disputed that the board made an offer in the spring of 1984 for Dr. Siegel to be accorded Associate Active Medical Staff status for a period of five years. The Bylaws indicate that such a status would preclude Dr. Siegel from serving on the Medical Executive

Committee to which Dr. Siegel argued that he was elected just prior to the board's denial of his application. Dr. Siegel maintains that this offer indicates that the board's sole intent was to keep Dr. Siegel off the Medical Executive Committee. This reasoning is faulty.

Testimony adduced before the Hearing Committee does indicate that Dr. Siegel was elected to one of the two newly created at-large representative positions on the Medical Executive Committee in December 1983. Other testimony reveals that these positions had not been formally approved at the time of Dr. Siegel's "election" or at the time of the board's action, and that the Bylaws had not been amended to reflect such a change.

Furthermore, the record shows that this offer was made to Dr. Siegel after the Hearing Committee initially recommended such an offer. The Hearing Committee made this proposal after first affirming the board's denial of reappointment, and also recommended:

"That Dr. Siegel stipulate in writing that he will adopt a constructive attitude in his relationships with medical colleagues, administrative personnel and the board of trustees; moreover, that he will refrain from public criticism of the hospital and its personnel." Report of the Hearing Committee at 3.

The Hearing Committee made these recommendations to promote "an opportunity for healing, over time, of the tensions and animosities that had developed."

Accordingly, the board's action was not an arbitrary or capricious attempt to keep Dr. Siegel from serving on the Medical Executive Committee.

### B

Dr. Siegel secondly contends that he was singularly selected by the board in denying his application. Dr. Siegel claims that there was other evidence produced before the Hearing Committee which disclosed instances in which no action was taken against other physicians who were reportedly critical and uncooperative.

From our review of the record, we agree with the trial court's conclusion:

"The court agrees that the record does reflect some uncooperative behavior on the part of other doctors. However, that evidence cannot be compared in *quantity, quality, intensity, or duration* to the evidence in the record regarding the plaintiff. The court therefore finds that the subject criteria for reappointment were not construed in a discriminatory manner in denying plaintiff's application for reappointment." (Emphasis added.) Partial Judgment Entry at 17.

Thus, Dr. Siegel was not selectively denied Medical Staff privileges as he contends.

### C

Dr. Siegel challenges the Statement of Charges which documented and formed the basis of the board's denial of Dr. Siegel's application for reappointment. He argues that these charges are arbitrary, capricious and unreasonable.

As stated previously, our review is limited to whether the board's conduct and interpretation of the Bylaws were arbitrary, capricious, unreasonable and discriminatory. The board recommended that Dr. Siegel's application for reappointment be denied as he failed to meet the standards of ethics, conduct and cooperation with hospital personnel required by the Bylaws. The Statement of Charges further indicates that the board "found that Dr. Siegel has engaged in a continuous pattern of negative, disruptive and destructive behavior inimical to the best interests of the Hospital." (Statement

of Charges at 1.) The board then listed incidents which evidenced Dr. Siegel's pattern of unacceptable behavior. It is these items that Dr. Siegel challenges.[8]

These items support the board's conduct in removing Dr. Siegel's privileges at Charity Hospital. The record indicates that the internal appellate review committees and the court found substantial evidence in the record to support the board's actions. Likewise, our review of the charges which formed the basis of the board's decision indicates that the board's action was not arbitrary, capricious or discriminatory.[9]

Thus, we cannot state that the board acted arbitrarily, capriciously, unreasonably or discriminatorily in refusing hospital privileges to Dr. Siegel on the basis of its application of Charity Hospital's Bylaws.

Accordingly, Dr. Siegel's third assignment of error is not well-taken.

## IV

For his fourth assignment of error, Dr. Siegel contends that the court refused to permit him any discovery of relevant evidence that might support his claim that the board's decision was arbitrary and capricious. Dr. Siegel also claims that it was error for the court to limit its consideration to evidence presented before the Hearing Committee. These contentions do not have merit.

The scope of judicial review of the case *sub judice* is limited. Subject to that limitation, a court should not substitute its judgment for the hospital trustees' judgment. *Khan, supra.* Dr. Siegel's argument would have the court expand its review and in essence

have a *de novo* review, contrary to the proscription that the court may not substitute its judgment.

R.C. 2305.251 also provides support for the court's granting of Charity Hospital's motion for a protective order, thereby precluding Dr. Siegel from discovering documents pursuant to Civ. R. 34.

Accordingly, Dr. Siegel's fourth assignment of error is not well-taken.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

KRUPANSKY and CIRIGLIANO, JJ., concur.

CIRIGLIANO, J., of the Court of Common Pleas of Lorain County, sitting by assignment in the Eighth Appellate District.

## APPENDIX

The findings of fact by the Hearing Committee as contained in its report of March 6, 1984 are:

"(1) Dr. Siegel has issued public statements containing false, misleading, and derogatory accusations against the hospital which have created a negative image of the hospital in the community, as specified in items a), b), and c) of Item 1 of said charges.

"(2) Dr. Siegel repeatedly has threatened litigation against the hospital in an apparent effort to coerce acquiescence to his demands, as specified in a) and b) of Item 2 of said charges.

"(3) Dr. Siegel has issued threats and demands relating to hospital programs in an apparent effort to coerce

---

[8] The record indicates that the Hearing Committee found that there was no proof presented to sustain Item 6 of the Statement of Charges.

[9] Dr. Siegel would have this court re-view the basis of almost every item in the Statement of Charges to determine if each part meets this standard. We conclude that our review can be limited to the totality of the board's conduct.

acquiescence to his demands, as specified in a), b), c), and d) of Item 3 of said charges.

"(4) Dr. Siegel made false and derogatory statements about hospital programs or patient care in an apparent effort to obtain his own ends, as specified in a), b) and c) of Item 4 of said charges.

"(5) Dr. Siegel, on several occasions, has reflected a disregard for and a refusal to cooperate with the medical staff, as specified in a), b), c), d), and e) of Item 5 of said charges, and this included a refusal to participate in a dialogue that he himself requested.

"(6) The Hearing Committee finds that there was no proof presented to sustain Item 6 of said charges.

"(7) Dr. Siegel has repeatedly defamed the hospital and hospital personnel in an apparent attempt to provoke divisiveness among and between the hospital administration, the medical staff, and the Board of Trustees, as specified in a), b), c), d), e), f), g), and h) of Item 7 of said charges.

"(8) Dr. Siegel has conducted himself in a negative, uncooperative, and disruptive manner for a number of years, as specified in b) and d) of Item 8 of said charges. The Hearing Committee finds that a) and c) of Item 8 of said charges have not been sustained by the evidence.

"(9) Dr. Siegel continued to conduct himself in a negative, uncooperative, and disruptive manner, despite corrective action initiated by the Board of Trustees on June 15, 1983, as specified in b) of Item 9 of said charges. The Hearing Committee finds that a) of Item 9 has not been sustained by the evidence.

"(10) Dr. Siegel's disruptive behavior has required the hospital administration, Board of Trustees, and medical staff to expend hundreds of hours discussing untruths and half truths in an attempt to promote and maintain a cooperative attitude between the administration and the staff and to protect and maintain the hospital's good reputation in the community.

"The Statement of Charges is incorporated by reference."